734 A.2d 257

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOHN MARTINI, SR., DEFENDANT–RESPONDENT, v. OFFICE OF PUBLIC DEFENDER, PETITIONER–APPELLANT.

Submitted October 14, 1998—Decided July 27, 1999.

251

*Mark H. Friedman* and *Theresa Yvette Kyles,* Assistant Deputy Public Defenders, submitted briefs on behalf of appellant (*Ivelisse Torres,* Public Defender, attorney).

*Susan W. Sciacca,* Deputy First Assistant Prosecutor, submitted a brief on behalf of respondent State of New Jersey (*William H. Schmidt,* Bergen County Prosecutor, attorney; *Ms. Sciacca, Fred L. Schwanwede,* First Assistant Prosecutor, and *Marilyn Goceliak Zdobinski,* Special Deputy Attorney General, of counsel).

*Alan L. Zegas* submitted a brief on behalf of respondent John Martini, Sr.

The opinion of the Court was delivered by

PORITZ, C.J.

This case comes to us on the Public Defender's petition for post-conviction relief over the objection of the defendant, John Martini, Sr., whose conviction of murder and sentence of death have been

upheld by this Court. The gravamen of the Public Defender's petition is that the failure to present certain mitigating evidence at defendant's penalty-phase trial "constituted ineffective assistance of counsel and otherwise violated defendant's constitutional rights." *State v. Martini*, 148 *N.J.* 453, 454, 690 *A.*2d 603 (1997) (*Martini IV*). Because this claim bears directly on the "reliability and integrity" of the jury's decision to impose death, we permitted the petition to go forward despite Martini's objection and remanded for further proceedings. We directed the appointment of standby counsel to represent Martini and required the proceedings below to be conducted *in camera* in furtherance of defendant's interest in maintaining the confidentiality of evidence the Public Defender wished to present to the trial court.

Today, we hold that in this case counsel's failure to discover and put forward evidence that contains both mitigating and damaging elements does not constitute ineffective assistance of counsel. Because we do not find merit in the Public Defender's other claims, we affirm the trial court's decision to deny post-conviction relief.

# I

## FACTS AND PROCEDURAL HISTORY

In 1990, a jury convicted Martini of the kidnapping murder of Irving Flax, a Fair Lawn business executive. The evidence at trial established that Martini and codefendant Therese Afdahl abducted Flax and demanded ransom money from his wife. Although the money was paid, Martini nevertheless shot Flax three times in the back of the head. The jury found that Martini killed Flax to prevent him from identifying defendant.

During the trial Martini did not dispute the kidnapping or that he had fired the three fatal shots. Instead, defendant asserted that his cocaine addiction diminished his capacity such that the murder was not committed purposely or knowingly. The jury rejected his claim at both the guilt and penalty-phase trials,

finding at the conclusion of the penalty phase that the aggravating factors, taken together or individually, outweighed the mitigating factors. The trial judge thereafter sentenced Martini to death.

Defendant's conviction and death sentence were upheld by this Court on direct appeal, *State v. Martini*, 131 *N.J.* 176, 619 *A.*2d 1208 (1993) (*Martini I*), and on proportionality review, *State v. Martini*, 139 *N.J.* 3, 651 *A.*2d 949 (1994) (*Martini II*). After the United States Supreme Court denied Martini's petition for *certiorari* on October 2, 1995, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995), the Law Division issued a warrant scheduling defendant's execution for November 15, 1995. On October 30, 1995, the Public Defender sought post-conviction relief ("PCR") and a stay of execution on defendant's behalf, even though Martini said that he did not wish to file any further appeals. In response, the trial court entered a stay and appointed independent counsel to represent Martini. The court also appointed a psychiatrist to conduct an examination of defendant to determine whether he was competent to waive PCR proceedings. Following a two-day hearing the court concluded that Martini was competent, and that the Public Defender could not pursue PCR on Martini's behalf without his consent. The stay of execution was continued pending review by this Court.

We held oral arguments on an expedited schedule. *State v. Martini*, 144 *N.J.* 603, 606, 677 *A.*2d 1106 (1996) (*Martini III*). We agreed with the trial court that the psychiatric evidence demonstrated Martini's competence to make the waiver decision and that he "ha[d] voluntarily expressed a desire to prosecute no further appeals." *Id.* at 617, 677 A.2d 1106. We explained, however, that the " 'State and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty.' " *Ibid.* (quoting *State v. Koedatich*, 112 *N.J.* 225, 332, 548 *A.*2d 939 (1988) (*Koedatich II*), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989)). Respect for Martini's choice could not take precedence over the paramount concern for "the reliability and integrity of a death sentencing decision." *Id.*

at 605, 677 A.2d 1106. Accordingly, we remanded the matter for a PCR hearing consonant with our decision and focused on three issues that were not capable of review on defendant's initial appeal:

> (1) a defense based on certain undisclosed information that has been imparted to the Public Defender and presumably was not disclosed to the jury below; (2) a new constitutional principle announced by the Supreme Court after Martini's trial in *Simmons v. South Carolina*, 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L.Ed.*2d 133 (1994); and (3) evidence disclosed after Martini's conviction that suggests that New Jersey's death penalty system may be constitutionally flawed because of systematic discrimination against blacks and other minorities.
>
> [*Id.* at 610–11, 677 A.2d 1106.]

On remand, the Public Defender attempted to present materials Martini considered confidential, claiming that the information contained therein constituted mitigating evidence erroneously omitted at the penalty-phase trial. As Martini expressed his continuing desire that this evidence remain confidential, the court conducted an *in camera* inspection of the Public Defender's submission and ruled that Martini's interest in maintaining the confidentiality of the submitted materials prevented their use in the PCR proceeding. The Public Defender sought leave to appeal the court's decision, which we granted.

On reviewing the record and written arguments of counsel, this Court vacated the trial court's order and again remanded the matter to permit the judge to "reconsider the issue of the omission of mitigating evidence from defendant's penalty-phase trial." *Martini IV, supra,* 148 *N.J.* at 453, 690 A.2d 603. We directed the lower court to determine:

> 1. Whether the evidence was mitigating;
>
> 2. If the evidence was mitigating, whether defense counsel's failure to obtain the evidence constituted ineffective assistance of counsel or whether the omission of the evidence constituted a manifest injustice and a violation of defendant's constitutional rights, entitling defendant to post-conviction relief;
>
> 3. If defendant is entitled to post-conviction relief because of the failure to obtain or the omission of the evidence, whether defendant has an interest in preserving the confidentiality of the evidence;
>
> 4. If defendant has such a confidentiality interest, whether that interest can be protected in a penalty-phase proceeding by imposing conditions on the admission of the evidence, such as *in camera* proceedings, redaction of information, or the

presentation of the evidence through summarization or paraphrasing in a form that will eliminate the concerns for confidentiality; and

5. If the evidence can be used subject to such conditions, whether the failure to use the evidence at the penalty-phase proceeding of defendant constitutes ineffective assistance of counsel or a manifest injustice and a violation of defendant's constitutional rights, entitling defendant to post-conviction relief. . . .

[*Id.* at 454, 690 *A.*2d 603.]

Lastly, we ordered the "hearing on remand [to] be conducted *in camera*, with the State and defendant being provided with all of the evidence at issue . . . subject to its absolute confidentiality and strict non-disclosure." *Ibid.*

Over the course of one year and one week, the trial judge heard testimony from Martini's original trial counsel (who had withdrawn from the case prior to trial), Martini's actual trial counsel, a member of the Bergen County Prosecutor's Homicide Squad (who initially investigated the Flax murder), and other witnesses. After hearing the testimony, reviewing all of the confidential evidence and listening to argument, the court determined that the evidence was not mitigating.

The court found that the testimony of Martini's trial counsel and the Public Defender first assigned to his case established that none of those attorneys would have used the alleged mitigating evidence in Martini's penalty-phase trial. To the contrary, trial counsel believed there was a substantial downside to the presentation of this evidence that outweighed any mitigating factors, and the Public Defender at that time saw the evidence as both "possibly good" and "not so hot." From this, the court concluded that the evidence "would [not] have had a significant impact on [the jury's] deliberations in that it [would not] have changed any one of [the juror's] minds[.]" Because the trial judge found that the Public Defender's evidence was not mitigating, counsel's failure to obtain it was not ineffective assistance of counsel. Similarly, the potentially damaging effect of the evidence eliminated the possibility that its omission constituted a manifest injustice to Martini.

In reaching this conclusion, the judge refused to allow two experts to testify on the mitigation value of the evidence. The Public Defender sought to introduce the testimony of mitigation specialists who would have described how the evidence could have provided a construct for a favorable social history of Martini. The judge determined that he did not need the aid of expert opinion because, as the trial judge in the murder and penalty-phase trials, he had acquired an understanding of the case that he was able to use in his evaluation of the evidence now proffered by the Public Defender. He further declined to admit the experts' reports, specifically holding that one of the reports was inadmissible because it was based in part on privileged communications between the expert and Martini.

Although the judge found that defendant's trial attorneys were not ineffective, he nonetheless answered the question "whether defendant has an interest in preserving the confidentiality of the evidence." The judge concluded that even if the evidence had some mitigating value, that minimal value was outweighed by Martini's substantial interest in maintaining the confidentiality of the information. He explained that if the information is presented at a new penalty-phase trial, criminal defendants will learn that they cannot share confidences with their attorneys without risking exposure at some later date. In the court's view, even though the evidence sought to be admitted was not revealed by the client, the effects of using it could be devastating to the attorney-client relationship. Because the judge concluded that the jury decision to impose the death penalty was reliable, defendant's interest in confidentiality tipped the scale against a new penalty trial. Moreover, in the judge's opinion Martini's confidentiality interest could not be adequately preserved in a new trial, even through *"in camera* proceedings, redaction of information, or the presentation of the evidence through summarization or paraphrasing . . . ." *Martini IV, supra,* 148 *N.J.* at 454, 690 *A.*2d 603.

After discussing the specific questions posed in *Martini IV,* the judge considered the additional points raised in the PCR petition

not related to the ineffective assistance of counsel claim. The Public Defender alleged that the State committed a *Brady* violation by failing to disclose the confidential information to the defense prior to Martini's murder trial. *See Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment...."). The judge found this claim to be without merit. He concluded that the State did not have knowledge of the evidence at the time and, therefore, could not be obligated to release it to defendant. Further, even if the prosecutors had imputed knowledge, there was no *Brady* violation because the defendant himself possessed the information and chose not to share it with his attorneys.

The court dismissed the claim that Martini's trial counsel were ineffective in failing to discover and present to the jury "burned screens" found in defendant's hotel room after he was arrested. The screens were overlooked by Martini's attorneys among the other evidence they reviewed before trial. Because the screens could have been used as additional evidence of defendant's cocaine use, the Public Defender argued that they would have strengthened Martini's diminished capacity defense. The court found that the evidence was cumulative and that it would not have altered the jury's decision to reject this defense.

The court also ruled that the failure to instruct the jury that Martini would be subject to a consecutive fifteen-year parole ineligibility period for the kidnapping offense did not deprive the defendant of his due process right to a reliable sentencing proceeding. On this point, the judge pointed out "that this jury knew, based on all the testimony ... as to Mr. Martini's age, his health[,] that certainly he would not be eligible for parole until he was 90 years old." The judge held that if there was error in these circumstances it was not harmful.

Finally, the court briefly considered the Public Defender's allegations that the death penalty is administered in a racially dis-

criminatory manner; that imposition of the death penalty is prohibited by international law; and that the cumulative effect of the errors at Martini's trial required a new penalty-phase proceeding. These claims were either dismissed or reserved to this Court (*i.e.*, the racial bias claim). Accordingly, the Public Defender's PCR petition was denied.

The Public Defender appeals the court's determinations on all of the claims raised in the PCR petition. Martini's special counsel requests that we affirm the decision below.

## II

### *LEGAL CLAIMS*

#### A. *Is the Evidence Mitigating?* [1]

The Public Defender asks us to set aside Martini's death sentence because the failure to present certain mitigating evidence at defendant's penalty-phase trial constituted ineffective assistance of counsel. This claim requires us to consider first whether the evidence is mitigating, a characterization vigorously contested both by the Bergen County Prosecutor and by Martini himself. Based on our review of the materials submitted by the Public Defender and the testimony at the hearing below, we conclude that the evidence presents a troubling picture that has some mitigation value mixed with a substantial downside potential. In effect, the usefulness of the evidence as mitigation is seriously undermined by its unfavorable aspects.

■ We recognize, also, that the evidence if used would have opened the door to damaging rebuttal evidence by the State. In a

---

[1] The record of the PCR proceedings has been sealed because of our concern in respect of Martini's confidentiality interest in the evidence proffered by the Public Defender. *Martini III, supra,* 144 *N.J.* at 611, 677 A.2d 1106; *see also Martini IV, supra,* 148 *N.J.* at 454, 690 A.2d 603 (ordering PCR hearing "shall be conducted *in camera* " with evidence admitted "subject to its absolute confidentiality and strict nondisclosure"). We are convinced that Martini's interest outweighs the public interest in disclosure and will review the Public Defender's claims without description of the specific information sought to be presented.

penalty-phase trial, the State is entitled to impeach mitigation testimony with relevant evidence of a defendant's past conduct, subject to an instruction that the evidence is admissible only for the limited purpose of rebutting mitigating factors and cannot be used to add to the weight assigned by the jury to the aggravating factors. *State v. Rose*, 112 *N.J.* 454, 503–08, 548 *A.2d* 1058 (1988); *see also State v. Bey*, 129 *N.J.* 557, 610, 610 *A.2d* 814 (1992) (*Bey III* ), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. McDougald*, 120 *N.J.* 523, 574, 577 *A.2d* 419 (1990). Even with a limiting instruction, in this case the presentation of evidence of limited mitigating value would have opened the door to powerful countervailing testimony that could have swayed the jury against defendant. *See State v. Morton*, 155 *N.J.* 383, 431–33, 715 *A.2d* 228 (1998) (recognizing defense counsel not ineffective for failing to present mitigating evidence where evidence had potential to harm defendant's mitigation case); *State v. Marshall*, 148 *N.J.* 89, 256, 690 *A.2d* 1 (1997) (*Marshall III* ) (denying claim of ineffective assistance of counsel involving omission of "evidence that, although possibly beneficial to defendant, posed the clear risk of an adverse jury reaction").

■ In reaching this conclusion, we are mindful that the omitted evidence has been separated into two sets by the Public Defender who argues that only the first is admissible. Specifically, the Public Defender claims that she should not have been ordered by the PCR court to serve the second set of material on the prosecution. She maintains that this set contains inculpatory information that would not have been used at trial, and thus is not discoverable under the principles of *State v. Williams*, 80 *N.J.* 472, 404 *A.2d* 34 (1979), and *State v. Mingo*, 77 *N.J.* 576, 392 *A.2d* 590 (1978). We are convinced that the first set is sufficiently injurious to Martini such that it too has only marginal mitigating value. For this reason, we need not reach a decision on the admissibility of the second set.[2]

---

[2] We note, however, that the second set of evidence appears to be discoverable by the State under the criminal reciprocal discovery rule. *Rule* 3:13–3(d)(2)

■ In evaluating the nature of this evidence we have independently reviewed two expert reports submitted by the Public Defender for the purpose of showing how the evidence could have been used to construct a favorable social history of Martini at his penalty-phase trial. The trial judge refused to allow the experts to testify or to admit their reports at the PCR hearing. We find that the reports are cumulative and add little to the Public Defender's arguments. Because the reports reflect the experts' anticipated testimony, and because expert testimony is only admissible if it "will assist the trier of fact to understand the evidence or determine a fact in issue," *N.J.R.E.* 702; *see also State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984), we cannot say the trial court abused its discretion in excluding the experts or the reports. In this case, there was ample testimony at the PCR hearing from Martini's prior counsel and others about the possible value of the proffered evidence in a penalty-phase trial.

### B. *Ineffective Assistance of Counsel*

■ In *Lockett v. Ohio*, the United States Supreme Court held that a defendant may not be precluded from presenting "as a mitigating factor, any aspect of [his or her] character or record . . . as a basis for a sentence less than death." 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L.Ed.*2d 973, 990 (1978); *see also State*

---

entitles the State to discovery of any relevant papers or documents "which are within the possession, custody or control of defense counsel." *Ibid.; see Marshall III, supra,* 148 *N.J.* at 275, 690 *A.*2d 1 (observing that, because "there is no Court Rule explicitly governing post-conviction discovery[,] . . . . [t]he proper approach is for courts to reason by analogy to existing discovery rules"). Although the Public Defender contends that the second set is immune from discovery under the principles set forth in *State v. Mingo* and *State v. Williams,* these cases address exceptions to the general discovery rule that are not obviously applicable here. *See Williams, supra,* 80 *N.J.* at 482, 404 *A.*2d 34 (holding that *Rule* 3:13–3 "applies to written statements or memoranda reporting or summarizing the oral statements made by any witness . . . the State may call . . . at trial only in a situation where the defense intends to use the statement or memoranda at trial"); *Mingo, supra,* 77 *N.J.* at 587, 392 *A.*2d 590 (holding that *Rule* 3:13–3 does not require discovery of expert's report defense does not intend to use at trial).

*v. Bey,* 112 *N.J.* 123, 156, 548 *A.*2d 887 (1988) (*Bey II* ) ("[A] state statute may not preclude the jury from considering any relevant mitigating evidence pertaining to any aspect of defendant's character."). Our concern for " 'a reliable penalty determination' " has persuaded us that "a defendant in a capital case [may not] execute even a knowing and voluntary waiver of his right to present mitigating evidence during the penalty phase." *Koedatich II, supra,* 112 *N.J.* at 330, 548 *A.*2d 939 (quoting *People v. Deere,* 41 *Cal.*3d 353, 222 *Cal.Rptr.* 13, 710 *P.*2d 925, 931 (1985)).[3] In this case, however, the evidence put forward by the Public Defender contains at best some mitigation potential balanced by a concomitant and substantial damaging effect. We must ask then, "whether defense counsel's failure to obtain [this] evidence constituted ineffective assistance of counsel or whether the omission of [this] evidence constituted a manifest injustice and a violation of defendant's constitutional rights, entitling defendant to post-conviction relief." *Martini IV, supra,* 148 *N.J.* at 454, 690 *A.*2d 603. That the evidence has limited mitigating value coupled with a potential to harm, and that Martini has expressed his desire to maintain the confidentiality of the evidence, must factor in our analysis.

## 1. *The Strickland/Marshall Test*

Under *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984), an ineffective assistance of counsel claim is made out upon proof that the representation is both deficient and prejudicial to the defendant. Counsel's representation is deficient if it falls "below an objective standard of reasonableness," *id.* at 688, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 693; it is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at

---

[3] This concern is akin to our determination at the outset of these proceedings that Martini could not be permitted to waive his right to a PCR hearing because of the public interest in a fair and nonarbitrary capital sentencing system. *Martini III, supra,* 144 *N.J.* at 613–14, 677 *A.*2d 1106.

698. The *Strickland* two-prong standard was adopted by this Court in *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987), as the appropriate measure of counsel's performance under Article I, Paragraph 10 of the New Jersey Constitution. Subsequently, in *State v. Davis,* we determined that the *Strickland/Fritz* standard would "adequately fulfill the constitutional guarantee" in capital cases. 116 *N.J.* 341, 357, 561 *A.*2d 1082 (1989).

■ In *Marshall III,* for the first time we had occasion to consider the *Strickland/Fritz* standard in the context of a penalty-phase proceeding. "Our recognition of the profound distinction between our circumscribed appellate-review function and the capital jury's significantly less-restricted role in deciding between life and death," led us to modify the prejudice prong of the *Strickland/Fritz* standard to reflect this dichotomy. *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1. Under the reformulation, prejudice is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Ibid.* As we noted in *Marshall III, supra,* that modification was "a necessary adaption of the literal *Strickland* standard to the realistic limitations on appellate review of jury penalty-phase deliberations." *Ibid.* We acknowledged that the reformulated standard essentially "equates with" the *Strickland* Court's understanding of "reasonable probability ... [as] 'a probability sufficient to undermine confidence in the outcome,' " *ibid.* (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698), and that it captures the "core meaning" of *Strickland, id.* at 251, 690 A.2d 1.

### 2. *Deficiency Prong*

The Public Defender argues that Martini's representation was rendered ineffective by trial counsel's failure to conduct a timely and effective investigation that would have uncovered the omitted evidence, and, then, to use it at Martini's penalty-phase trial. We reject both claims.

█ "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. Whether this duty has been satisfied is measured by "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Ibid.* Put differently, when counsel's decision to limit an investigation is supported by "reasonable professional judgments," we will not find deficient performance. *Burger v. Kemp,* 483 *U.S.* 776, 794, 107 *S.Ct.* 3114, 3125, 97 *L.Ed.*2d 638, 657; *accord State v. Savage,* 120 *N.J.* 594, 624, 577 *A.*2d 455 (1990).

█ In some cases, whether counsel's conduct is reasonable "may be determined or substantially influenced by the defendant's own statements or actions." *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2061, 80 *L. Ed.*2d at 695. Thus, when the "defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Ibid.,* 466 *U.S.* at 691, 104 *S.Ct.* at 2061, 80 *L.Ed.*2d at 696; *see also Dooley v. Petsock,* 816 *F.*2d 885, 890–91 (3d Cir.), *cert. denied,* 484 *U.S.* 863, 108 *S.Ct.* 182, 98 *L.Ed.*2d 135 (1987) ("A trial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession. . . .").

█ Here, counsel's failure to discover the omitted evidence was significantly affected by Martini's conduct. Martini purposely hid information from his attorney and deflected questions put to him because he considered the information to be confidential. Martini's trial counsel testified at the PCR hearing that he had asked defendant about the possibility that additional evidence existed and that defendant had responded: "it had no bearing on the case." When the information was discovered later Martini expressed his desire to keep it from being used in either the PCR hearing or in a new penalty-phase trial. *Martini III, supra,* 144 *N.J.* at 619–20, 677 *A.*2d 1106 (Coleman, J., dissenting). That he

did not want his attorneys to know about or use the information at his first penalty-phase trial is clear. In these circumstances, it was reasonable for his attorneys to conclude that further investigation would not yield anything useful.

■ To the extent that Martini's lawyers had some idea that there was additional evidence, it also was reasonable for them to believe its discovery would result in more harm than good. On being informed about the nature of the evidence, trial counsel testified that, had he discovered it, he would "most likely" have kept it out because of its potentially damaging effect. Even Martini's original attorney, who had some limited knowledge of the evidence at the time, understood that it was both "possibly good" and "not so hot." Because the evidence, "although possibly beneficial to the defendant, posed the clear risk of an adverse jury reaction," *Marshall III, supra,* 148 *N.J.* at 256, 690 *A.*2d 1, the decision to forego further investigation is supported by reasonable professional judgment and does not constitute deficient performance. *See Boyd v. Johnson,* 167 *F.*3d 907, 911 (5th Cir.1999) (declaring capital defendant's attorney "did not perform deficiently in failing to investigate the issue further" because the evidence "may have influenced the jury negatively"), *petition for cert. filed,* 68 *U.S.L.W.* 3136, 1999 WL 412897 (June 11, 1999) (No. 98–9745).

### 3. *Prejudice Prong*

We begin our analysis of the prejudice prong with the *Marshall III* reformulation. The Public Defender claims that there is a reasonable probability that the jury's deliberations would have been affected substantially if the omitted evidence had been presented during Martini's penalty-phase trial. In *Marshall III,* we reviewed a similar claim in connection with certain mitigating evidence not adduced at Marshall's penalty-phase trial, and concluded that the evidence was either flawed or not likely to have affected the jury. *Marshall III, supra,* 148 *N.J.* at 252, 690 *A.*2d 1. Marshall complained that his sister and son would have testified "that his family loved him, and that his execution would

harm the family." *Ibid.* Recognizing that Marshall had "already inflicted grievous harm on [his] family by" contracting for his wife's murder, and that the jurors would likely "have been offended" by such testimony, we rejected Marshall's claim. *Ibid.* Although *State v. Morton,* 155 *N.J.* 383, 715 *A.*2d 228 (1998), was a direct appeal, it also is instructive. In *Morton,* we rejected another ineffective assistance claim based on trial counsel's failure to call defendant's mother and daughter or to bring in a social worker to present a social history of defendant. *Id.* at 432, 715 *A.*2d 228. There, we reasoned that the testimony could have portrayed defendant in a negative light or undermined counsel's attempts to portray defendant's mother as an inadequate parent. *Id.* at 431–32, 715 *A.*2d 228.

██  The evidence on which the Public Defender has based her ineffective assistance claim in this case is no different. Here, although there is some marginal mitigation value to the omitted material, its potentially harmful nature and the damaging rebuttal opportunity it provides, weigh heavily against presenting it to a jury. We hold that the absence of the evidence at Martini's penalty-phase trial was not prejudicial.

### C. *Brady Claim*

██  In *Brady v. Maryland,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963). The *Brady* rule was later held to apply even where, as here, the defendant makes no formal request for *Brady* material. *United States v. Agurs,* 427 *U.S.* 97, 107, 96 *S.Ct.* 2392, 2399, 49 *L.Ed.*2d 342, 351–52 (1976); *State v. Knight,* 145 *N.J.* 233, 245, 678 *A.*2d 642 (1996). In order to establish a *Brady* violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material. *Moore*

*v. Illinois,* 408 *U.S.* 786, 794–95, 92 *S.Ct.* 2562, 2568, 33 *L.Ed.*2d 706, 713 (1972).

Our discussion of the *Strickland/Marshall* test is directly pertinent to the question whether the proffered evidence in this case is "material." In *United States v. Bagley,* the United States Supreme Court adopted a unitary materiality standard applicable in all *Brady* violation cases. 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985); *see also Kyles v. Whitley,* 514 *U.S.* 419, 433, 115 *S.Ct.* 1555, 1565, 131 *L.Ed.*2d 490, 505 (1995). Under the unitary standard, as adopted by this Court in *State v. Knight,*[4] *supra,* evidence is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494; *accord Kyles, supra,* 514 *U.S.* at 433, 115 *S.Ct.* at 1565, 131 *L.Ed.*2d at 505; *Knight, supra,* 145 *N.J.* at 246, 678 *A.*2d 642. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L. Ed.*2d at 494.

As we discussed *supra* at 261–63, 734 *A.*2d at 264–66, we cannot say that it is reasonably probable that disclosure of the omitted evidence would have resulted in a different outcome because, although the evidence has some mitigating value, it poses a "clear risk of an adverse jury reaction." *Marshall III, supra,* 148 *N.J.* at 258, 690 *A.*2d 1. We reach this conclusion for the reasons previously expressed. First, the evidence itself has the potential to negatively influence the jury. *See supra* at 261–62, 734 *A.*2d at 265. Second, presentation of the evidence would afford the State the opportunity to present damaging rebuttal evidence, albeit subject to a limiting instruction. *Bey III, supra,* 129 *N.J.* at 610, 610 *A.*2d 814; *McDougald, supra,* 120 *N.J.* at 574,

---

[4] In *Knight,* we left open the question whether, as a matter of state law, we would apply the *Bagley* materiality standard where the defendant has made a specific request for *Brady* materials. 145 *N.J.* at 247, 678 *A.*2d 642. Because Martini did not request *Brady* materials, we need not decide that issue.

577 *A.*2d 419; *Rose, supra,* 112 *N.J.* at 503–08, 548 *A.*2d 1058. We conclude that it is not reasonably probable the result would have been different such that our confidence in the outcome is undermined.[5]

### D. *Manifest Injustice*

Although the ineffective assistance of counsel and *Brady* claims fail, we consider whether the omission of the evidence at the penalty-trial phase constituted a manifest injustice. *See Koedatich II, supra,* 112 *N.J.* at 330, 548 *A.*2d 939 ("recognizing there is institutional 'interest in a reliable penalty determination'") (quoting *Deere, supra,* 222 *Cal.Rptr.* 13, 710 *P.*2d at 931). Our ultimate goal in reviewing any death sentence is always to ensure that it is reliable, accurate, and nonarbitrary. *State v. Biegenwald,* 126 *N.J.* 1, 46–47, 594 *A.*2d 172 (1991); *see also Martini III, supra,* 144 *N.J.* at 614, 677 *A.*2d 1106 ("The Court is ... required to ensure the integrity of death sentences in New Jersey"). For the reasons expressed in our review of the Public Defender's *Strickland* and *Brady* claims, we are confident that Martini's death sentence is fair and reliable.

---

[5] Because we have held that the omitted evidence is not "material" to defendant's punishment, we need not consider whether Martini's knowledge and intentional concealment of the omitted information bar a *Brady* claim. We note without reaching the issue, that a number of United States Circuit Courts of Appeals have concluded that because the purpose of *Brady* is to assure that the accused is not denied access to favorable evidence known to the prosecution, there can be no *Brady* violation where the accused or his counsel knows before trial about the information and makes no effort to obtain its production. *See, e.g., Government of the Virgin Islands v. Martinez,* 831 *F.*2d 46, 48 (3d Cir.1987) (holding *Brady* violation cured where defendant had knowledge of information withheld by prosecution and willfully failed to disclose it to defense counsel); *United States v. Dupuy,* 760 *F.*2d 1492, 1501 n. 5 (9th Cir.1985) (reasoning there can be no *Brady* violation where defendant has means of obtaining information but does not pursue it); *United States v. Griggs,* 713 *F.*2d 672, 674 (11th Cir.1983) (observing that "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government").

We do not address the Public Defender's contention that the prosecution "knew or should have known" that the evidence existed.

In reaching this conclusion, we have weighed both the character of the evidence and Martini's interest in maintaining its confidentiality. We need not decide whether defendant's confidentiality interest alone is sufficient to exclude the evidence at a new penalty-phase trial. *See Koedatich II, supra,* 112 *N.J.* at 336, 548 *A.*2d 939. When his interest is set off against the marginal mitigation value of the evidence and its potential to bring about an adverse jury reaction, we have no doubt but that the balance tips against disclosure. *See Martini III, supra,* 144 *N.J.* at 611, 677 *A.*2d 1106.

Another factor must be considered. Since Martini's conviction and sentence of death, certain events have occurred that would negatively affect a new penalty-phase trial. Martini has twice been convicted of murder in Pennsylvania and Arizona. These convictions would be brought to the attention of the new penalty-phase jury as an aggravating factor. *State v. Biegenwald,* 110 *N.J.* 521, 540, 542 *A.*2d 442 (1988). Also, to prevent the Public Defender from filing a PCR petition, Martini submitted an affidavit acknowledging that he was "not adversely effected [sic] by drugs or alcohol at the time" of the Flax murder and that he committed the murder with "a clear mind." By his own words, Martini has irreparably subverted his original mitigation case wherein he claimed the c(5)(a) mitigating factor, that he was under the influence of extreme mental or emotional disturbance, because at the time of the murder he used cocaine.[6]

### E. *Trial Counsel's Failure to Discover and Presentthe Burned Screens at the Penalty–Phase*

■ The Public Defender argues that Martini's trial attorneys rendered ineffective assistance of counsel by failing to find and use

---

[6] Having concluded that Martini's death sentence is fair and reliable and, therefore, that he is not entitled to post-conviction relief, we need not decide whether Martini's interest in preserving the confidentiality of the evidence "can be protected in a penalty-phase proceeding by imposing conditions on the admission of the evidence." *Martini IV, supra,* 148 *N.J.* at 454, 690 *A.*2d 603.

at both the guilt and penalty-phase trials five burned cocaine screens that were found in Martini's and Afdahl's shared apartment and then placed in the State's physical evidence file. Although Martini's trial attorneys presented other drug paraphernalia at trial, they missed the five screens among the various items in the State's file. The Public Defender claims the screens would have provided additional critical support for the defense theory that Martini's drug addition had diminished his capacity and, more specifically, that he had used cocaine around the time of the murder.

Trial counsel's failure to find the burned cocaine screens was inadvertent. Presumably, Martini knew the screens existed although he never mentioned them. The question remains, however, "whether the production of additional mitigating evidence would have been likely to have a substantial effect on the jury's deliberations." *Marshall III, supra,* 148 *N.J.* at 250–51, 690 *A.*2d 1; *see also Morton, supra,* 155 *N.J.* at 431, 715 *A.*2d 228. Given counsel's presentation of other drug paraphernalia, including a glass cocaine pipe and a glass vial, and a certified laboratory report indicating that both the pipe and the vial contained trace elements of cocaine, the burned screens would have added only cumulative weight to the argument that Martini had used cocaine around the time of the murder.

We do not believe that this additional evidence would have substantially affected the jury's deliberations and, therefore, also reject the Public Defender's claim of ineffective assistance of counsel on this issue.

### F. *Trial Court's Failure to Inform the Jury that the Alternative to a Death Sentence Might Include a Period of Parole Ineligibility Beyond Thirty Years*

The Public Defender contends that the failure of the trial court to inform the jury about Martini's aggregate parole ineligibility, which could exceed thirty years, denied Martini his right to due process of law and subjected him to cruel and unusual punishment.

On direct appeal, we rejected this argument. *Martini I, supra,* 131 *N.J.* at 308, 619 *A.*2d 1208. Because defense counsel had not asked the trial court to so inform the jurors, and because the jury knew "of the practical consequences of defendant's life sentence," we held that the trial court's failure to instruct the jury concerning the aggregate period of parole ineligibility was not error. *Id.* at 313, 619 *A.*2d 1208. After our decision, the United States Supreme Court decided *Simmons v. South Carolina,* 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L. Ed.*2d 133 (1994). The Public Defender now argues that under *Simmons,* the Court must reverse on the lack of an instruction concerning sentencing alternatives. We disagree.

In *Simmons,* the State presented "future dangerousness [as] a factor for the jury to consider when fixing the appropriate punishment." *Id.* at 157, 114 *S.Ct.* at 2190, 129 *L.Ed.*2d at 139. In response, the defendant sought an instruction that would explain to the jury "that 'life imprisonment' did not carry with it the possibility of parole in [defendant's] case." *Id.* at 158, 114 *S.Ct.* at 2191, 129 *L.Ed.*2d at 139. The trial court refused; moreover, when the jury asked about the possibility of parole, the court instructed the jurors " 'not to consider parole or parole eligibility in reaching [a] verdict.' " *Id.* at 160, 114 *S.Ct.* at 2192, 129 *L.Ed.*2d at 140.

The Supreme Court vacated Simmons's death sentence. The Court explained:

[I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

[*Id.* at 168–69, 114 *S.Ct.* at 2196, 129 *L.Ed.*2d at 145–46.]

First, in the instant case the State has not offered "defendant's 'future dangerousness' as an aggravating factor," nor could it do so. *State v. Loftin,* 146 *N.J.* 295, 371, 680 *A.*2d 677

(1996) (*Loftin I*). As we pointed out in *Loftin I*, "[f]uture dangerousness is not an aggravating factor in New Jersey, and our statute limits prosecutors to the enumerated aggravating factors."[7] *Ibid.* Although we determined in *Loftin I* that "the holding of *Simmons* [was] therefore inapplicable ....," *ibid.*, we required that

> in future cases, if the court, based on the evidence presented believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed.
>
> [*Id.* at 372, 680 *A.*2d 677.]

Second, Martini's attorney "effectively made the argument that defendant was not likely to live long enough to be released after a thirty-year period of parole ineligibility." *Martini I, supra,* 131 *N.J.* at 312–13, 619 *A.*2d 1208. Most important, the jury knew that Martini, already sixty-years old at the time of trial, would be approaching ninety before he could be released and would, in all likelihood, die in prison. This is not a case in which "[t]he jury was left to speculate about [the defendant's] ... future dangerousness." *Simmons, supra,* 512 *U.S.* at 165–66, 114 *S.Ct.* at 2195, 129 *L.Ed.*2d at 144. Martini was not, in these circumstances, denied due process of law.

### G. *International Law*

■ In *State v. Nelson,* we rejected the Public Defender's argument that New Jersey's death penalty violates international customary law, concluding that "[t]he United States of America has not subscribed to any international human rights accord that has invalidated the death penalty." 155 *N.J.* 487, 512, 715 *A.*2d 281 (1998), *cert. denied,* —— *U.S.* ——, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999) (citations omitted). We reject the Public Defender's claim once again in this case.

---

[7] We note also that *Simmons* established a new federal rule of law that is not applicable on collateral review. *See O'Dell v. Netherland,* 521 *U.S.* 151, 166, 117 *S.Ct.* 1969, 1978, 138 *L.Ed.*2d 351, 364 (1997).

## H. *Systemic Racial Discrimination*

In *State v. Loftin*, we reaffirmed our commitment to " 'the prevention of any impermissible discrimination in imposing the death penalty.' " 157 *N.J.* 253, 298, 724 *A.*2d 129 (1999) (*Loftin II*) (quoting *State v. Marshall*, 130 *N.J.* 109, 135, 613 *A.*2d 1059 (1992) ). We found, however, that the results of the statistical models developed as part of the Court's frequency review have not " 'relentlessly documented the risk' of racial disparity in the imposition of the death penalty." *Id.* at 315, 724 *A.*2d 129; *see also State v. Chew*, 159 *N.J.* 183, 223, 731 A.2d 1070 (1999); *State v. Cooper*, 159 *N.J.* 55, 115–16, 731 *A.*2d 1000 (1999); *State v. Harvey*, 159 *N.J.* 277, 319–20, 731 *A.*2d 1121 (1999). We therefore also reject the Public Defender's claim of systemic racial discrimination for the reasons stated in *Loftin II.*

## I. *Cumulative Effect of the Errors*

The Public Defender's final claim is that the cumulative effect of the errors in this case warrants reversal of Martini's death sentence. The errors complained of are not independent of the claims we have already addressed. We conclude that the errors in the aggregate were not clearly capable of affecting the jury's determination that death is the appropriate sentence. *State v. Marshall*, 123 *N.J.* 1, 170, 586 *A.*2d 85 (1991).

## III

### *CONCLUSION*

We affirm the denial of defendant's petition for post-conviction relief.

COLEMAN, J., concurring.

The trial court found that defendant is competent and that he has voluntarily, knowingly, and intelligently waived his right to pursue post-conviction relief pursuant to *Rule* 3:22. I continue to agree with the trial court, and would have declined to consider the

post-conviction relief application by the Public Defender, over defendant's objections, for the reasons expressed in *Martini III, supra,* 144 *N.J.* at 618–27, 677 *A.*2d 1106 (Coleman, J., dissenting). I agree with the trial court's determinations in both *Martini III* and *Martini IV, supra,* 148 *N.J.* at 455, 690 *A.*2d 603.

Now that the Court has permitted the post-conviction relief proceedings to be conducted, I agree with the conclusion reached in Chief Justice Poritz's opinion that the trial court properly denied the post-conviction relief application. That conclusion and the reasoning advanced to support it are consistent with my views expressed in *Martini III* and *Martini IV.* I therefore concur in Chief Justice Poritz's opinion and the Court's judgment affirming the trial court's denial of post-conviction relief.

Justice GARIBALDI joins in this opinion.

O'HERN, J., concurring.

I concur in the judgment of the Court. I write separately to set forth my reasoning.

This is an application for post-conviction relief in a capital case based in part on a claim of ineffective assistance of counsel at trial. The claim relates to counsel's failure to obtain and present at trial certain confidential information concerning Martini's character. I am satisfied that reasonably competent capital counsel would have obtained the information. The question is whether "the jury's penalty-phase deliberations would have been affected substantially" if the information had been obtained and presented at trial. *State v. Marshall,* 148 *N.J.* 89, 250, 690 *A.*2d 1 (1997) (*Marshall III* ). Under a constitution that guarantees public trials it would be impossible to conduct a partially-closed penalty-phase hearing. Even if such a closed hearing were not illegal, it would be unwise.

In *Marshall III, supra,* the Court adopted a different test than the *Strickland/Fritz* [1] test for application in penalty trials to

---

[1] *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987).

measure ineffective assistance of counsel claims. We departed from United States Supreme Court precedent:

[R]ecall that the *Strickland* court rejected as too severe a standard for prejudice a requirement that "counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland, supra,* 466 *U.S.* at 693, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 697–98. The Court instead adopted what it described as a "somewhat lower" standard, requiring a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and observing that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The Court emphasized, however, that the standards it had adopted "do not establish mechanical rules." *Id.* at 696, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699.

[*Id.* at 248, 690 *A.*2d 1.]

In contrast, the *Marshall III* Court held:

Our recognition of the profound distinction between our circumscribed appellate-review function and the capital jury's significantly less-restricted role in deciding between life and death informs our application of the prejudice prong of *Strickland /Fritz* to penalty-phase proceedings. That distinction demonstrates that a reviewing court strays from its traditional function if it attempts to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient. In our view, an adaptation of the *Strickland/Fritz* prejudice test to capital-case penalty-phase proceedings that more faithfully reflects our appellate function would require courts to determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially. That standard is, in our view, more consistent with the *Strickland* Court's admonition that a "reasonable probability that the result of the proceeding would have been different" is "a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The reasonable probability that ineffective assistance of counsel in the penalty phase of a capital case substantially affected the jury's penalty-phase deliberation equates with "a probability sufficient to undermine confidence in the outcome."

[*Id.* at 250, 690 *A.*2d 1.]

I am satisfied that some of the undisclosed information "would have affected substantially" the jury's deliberations. To explain my reasoning is difficult when the reader does not know the contents of the undisclosed information. The reader will have to take my word for it that much of the information contained in the undisclosed files might have been considered mitigating by a jury. I certainly learned things about defendant that I did not know from his original appeal.

Hence, for me, the question comes down to whether Martini's interest in preserving the confidentiality of the undisclosed infor-

mation outweighs society's interest in seeing that the death penalty is imposed fairly and rationally. *See State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988) (*Koedatich* II), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), and *appeal after remand,* 118 *N.J.* 513, 572 *A.*2d 622 (1990). In *Koedatich,* the Court explained that our procedures for trial and appeal are

> established not only to protect the interests of the accused, but also to enable a state to enact a constitutional death penalty statute.... A defendant who prevents the presentation of mitigating evidence "withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence...."
>
> [*Id.* at 331–32, 548 *A.*2d 939 (citation omitted).]

A jury verdict is not irrational when the defendant's reasons for excluding the evidence are not irrational. That is plainly the case here. In addition, as the Court explains, the information might cut both ways, lending further rationality to a decision to withhold the evidence.

Justice STEIN joins in this opinion.

HANDLER, J., dissenting.

The Office of the New Jersey Public Defender appeals the denial of its petition for post-conviction relief (PCR) from the conviction of murder and sentence of death imposed on John Martini, Sr. Although the Office of the Public Defender seeks vacation of defendant's death sentence, it filed its petition without Martini's approval. Martini, through personal counsel, contests the Public Defender's appeal, as does the Bergen County Prosecutor.

This Court has twice affirmed the Public Defender's right to pursue post-conviction proceedings on Martini's behalf despite defendant's desire not to. The present case, however, marks the Court's first opportunity to assess the merits of the Public Defender's PCR petition. The foundation of the Public Defender's appeal is that newfound mitigating evidence is sufficient to warrant a reversal of Martini's death sentence and a new penalty-phase trial. The PCR court concluded that the evidence was not

mitigating and denied relief. In my opinion, that decision lacks critical support and was in error. This Court's affirmance of that judgment, I respectfully urge, is similarly unsupportable.

The evidence crucial to this proceeding, although double-edged, is mitigating nonetheless. It amply supports the Public Defender's claim that defendant's counsel provided ineffective assistance by failing to uncover and present the contested evidence in the penalty phase of defendant's trial, as well as the claim that the State's failure to disclose the evidence violated due process. Accordingly, this Court should reverse the court's order on post-conviction review and vacate defendant's death sentence.

A deeper problem looms. The Court does not acknowledge a fundamental dilemma and consequently fails to recognize that the State cannot, in any principled way consistent with constitutional standards, prosecute defendant for capital murder and exact the death penalty. Both defendant and the State, pursuant to its responsibility for the fair administration of the death penalty, have a confidentiality interest in the newly discovered evidence. The evidence may not, therefore, be introduced in a public proceeding; nor may that evidence be used in an *in camera* proceeding, in observance of defendant's constitutional right and the public's entitlement to a fair and open trial. Yet, to seek the death penalty in a trial that denies defendant this newly discovered mitigating evidence would deprive defendant of full constitutional protections that require the use of mitigating evidence in an open trial.

The just resolution is inescapable: the petition for post-conviction relief must be granted; defendant's death sentence must be vacated; and the matter remanded for the imposition of a life sentence.

I

A.

The death penalty must be administered with a basic respect for human dignity. *U.S. Const.* amend. VIII, XIV; *N.J. Const.* art. I,

¶ 12; *see Trop v. Dulles*, 356 *U.S.* 86, 100, 78 *S.Ct.* 590, 597–98, 2 *L.Ed.*2d 630, 642 (1958) (plurality opinion). Therein lies the notion that capital punishment must reflect contemporaneous standards of decency and be consistently applied. *Furman v. Georgia*, 408 *U.S.* 238, 274–79, 92 *S.Ct.* 2726, 2744–47, 33 *L.Ed.*2d 346, 369–72 (1972) (Brennan, J., concurring); *id.* at 309–10, 92 *S.Ct.* at 2762–63, 33 *L.Ed.*2d at 390 (Stewart J., concurring); *State v. Ramseur*, 106 *N.J.* 123, 169, 190, 524 *A.*2d 188 (1987).

The State is fundamentally responsible for maintaining these standards, and the ultimate exercise of such duties rests with an informed and unbiased sentencer, be it jury or judge. "In capital cases, jury sentencing constitutes a link between contemporary community values and the penal system." *State v. Bey*, 112 *N.J.* 123, 162, 548 *A.*2d 887 (1988) (*Bey II*) (citing *Gregg v. Georgia*, 428 *U.S.* 153, 173, 96 *S.Ct.* 2909, 2925, 49 *L.Ed.*2d 859, 874 (1976)); *see Witherspoon v. Illinois*, 391 *U.S.* 510, 520 n. 15, 88 *S.Ct.* 1770, 1776 n. 15, 20 *L.Ed.*2d 776, 783 n. 15 (1968) (noting that in exercising the discretion to choose between life imprisonment and capital punishment juries "maintain a link between contemporary community values and the penal system") (citation omitted). Insofar as the jury speaks as the "conscience of the community," a jury verdict of capital punishment validates the death penalty. *See Bey II, supra*, 112 *N.J.* at 162, 548 *A.*2d 887; *Ramseur, supra*, 106 *N.J.* at 316, 524 *A.*2d 188. In order to ensure that the State does not "inflict[ ] upon some people a severe punishment that it does not inflict upon others," *Furman, supra*, 408 *U.S.* at 274, 92 *S.Ct.* at 2744, 33 *L.Ed.*2d at 369 (Brennan, J., concurring), it is crucial that the sentencer "evaluate the unique circumstances of the individual defendant," *Spaziano v. Florida*, 468 *U.S.* 447, 459, 104 *S.Ct.* 3154, 3161, 82 *L.Ed.*2d 340, 351 (1984). The sentencer must consider "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976). In short, for the protection of the rights of individual defendants, and to maintain the

validity of a death penalty administration, "[t]he jury should know whom it is sentencing to death." *Bey II, supra,* 112 *N.J.* at 157, 548 *A.*2d 887.

It is essential, in furtherance of this constitutional mandate, that the sentencer in a capital case "not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion) (emphasis in original). "Jurors *must* be permitted to consider and give effect to *any* mitigating evidence." *State v. Biegenwald,* 126 *N.J.* 1, 48, 594 *A.*2d 172 (1991) (emphasis in original); *see Bey II, supra,* 112 *N.J.* at 156, 548 *A.*2d 887; *Ramseur, supra,* 106 *N.J.* at 185–86, 524 *A.*2d 188. Only a fully informed jury can perform its function and thereby safeguard the State's interest in reliable death sentences. *See State v. Hightower,* 120 *N.J.* 378, 415, 577 *A.*2d 99 (1990); *State v. Koedatich,* 112 *N.J.* 225, 332, 548 *A.*2d 939 (1988) (*Koedatich II* ), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). Where a sentencing jury cannot evaluate all evidence that is mitigating, the death penalty may not, constitutionally, be imposed. *See, e.g., Hitchcock v. Dugger,* 481 *U.S.* 393, 399, 107 *S.Ct.* 1821, 1824–25, 95 *L.Ed.*2d 347, 352 (1987) (reversing death sentence where trial court instructed jury that death penalty statute precluded consideration of unenumerated mitigating factors); *Skipper v. South Carolina,* 476 *U.S.* 1, 8–9, 106 *S.Ct.* 1669, 1673, 90 *L.Ed.*2d 1, 9 (1986) (holding death sentence invalid where sentencing court excluded evidence of defendant's positive adjustment in prison); *Eddings v. Oklahoma,* 455 *U.S.* 104, 116–17, 102 *S.Ct.* 869, 878, 71 *L.Ed.*2d 1, 12 (1982) (holding death sentence invalid where sentencing judge failed to consider evidence of young defendant's family troubles); *Lockett, supra,* 438 *U.S.* at 608–09, 98 *S.Ct.* at 2967, 57 *L.Ed.*2d at 992 (reversing death sentence and holding unconstitutional statute that limited jury's consideration of relevant mitigating evidence); *cf. Morgan v. Illinois,* 504 *U.S.* 719, 739, 112 *S.Ct.* 2222, 2235, 119 *L.Ed.*2d 492,

509 (1992) (reversing death sentence after inadequate voir dire led to risk that at least one juror may have been unable to consider and give effect to all relevant mitigating evidence). It follows that when it is evident that mitigating evidence will be ignored or unpresented, the State may not, constitutionally, seek the death penalty. The State may not, in such circumstances, proceed to prosecute a defendant for capital murder.

## B.

This appeal revolves around evidence discovered by the Public Defender after defendant was convicted and sentenced to death. The Public Defender argues that the discovery of newfound relevant mitigating evidence entitles defendant to a new trial. The Public Defender also claims reversible error lies in defense counsel's failure to discover and present that evidence at defendant's penalty phase trial; and, further, that because the State knew or should have known of the evidence, the State's failure to divulge the evidence to defense counsel violated defendant's right to due process of law in accordance with *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963).

The Public Defender's primary contention, that the evidence was mitigating, bears directly on the other claims. Indeed, the mitigating nature of the evidence is a prerequisite to a finding of prejudice required for ineffective assistance of defense counsel or to a finding of materiality necessary to support a *Brady* violation. Even so, newly found evidence is probative and relevant even in the absence of or apart from other violations of constitutional dimension, such as claims of ineffective assistance of counsel or a *Brady* violation, and may alone be a basis for reversal.[1] Accordingly, in *State v. Martini*, 148 *N.J.* 453, 690 *A.*2d 603 (1997)

---

[1] We should distinguish claims based on newly discovered evidence relevant to capital sentencing trials, in which the omission of evidence bears materially on whether the death sentence was validly imposed, from similar claims pertaining to the guilt/innocence phase of capital prosecutions. In *Ford v. Wainwright*, 477 *U.S.* 399, 106 *S.Ct.* 2595, 91 *L.Ed.*2d 335 (1986), the Supreme Court reversed the defendant's death sentence pursuant to the Eighth Amendment in light of newly

(Order) (*Martini IV*), in which we vacated the PCR court's order barring disclosure of the evidence and remanded for post-conviction review, we directed the trial court, as a preliminary matter, to ascertain whether the evidence was "mitigating," and then asked "whether defense counsel's failure to obtain the evidence constituted ineffective assistance of counsel *or* whether the omission of the evidence constituted a manifest injustice and a violation of defendant's constitutional rights, entitling defendant to post-conviction relief." *Id.* at 454, 690 *A.*2d 603 (emphasis added). Consideration of the Public Defender's appeal, therefore, must begin with the determination of whether the evidence is mitigating, and an assessment of whether the discovery of the evidence is sufficient to warrant a new trial in its own right.

There is no dispute that the evidence presented is, in part, mitigating. As a general matter, evidence is "mitigating" insofar

---

discovered evidence that the defendant was insane. In contrast, in *Herrera v. Collins*, 506 *U.S.* 390, 113 *S.Ct.* 853, 122 *L.Ed.*2d 203 (1993), the Supreme Court held that Eighth and Fourteenth Amendment claims of actual innocence based on newly discovered evidence are not, in the absence of other constitutional claims, grounds for habeas corpus relief for death-sentenced defendants. The Supreme Court recognized in *Herrera*, however, that more lenient standards would apply for newly discovered evidence pertinent to a capital defendant's sentencing proceeding. Distinguishing *Ford, supra,* the Court stated: "Unlike petitioner here, Ford did not challenge the validity of his conviction. Rather, he challenged the constitutionality of his death sentence in view of his claim of insanity. Because Ford's claim went to a matter of punishment—not guilt—it was properly examined within the purview of the Eighth Amendment." *Herrera, supra,* 506 *U.S.* at 406, 113 *S.Ct.* at 863, 122 *L.Ed.*2d at 220. *But see Boyde v. California,* 494 *U.S.* 370, 380, 110 *S.Ct.* 1190, 1198, 108 *L.Ed.*2d 316, 329 (1990) (applying 'reasonable likelihood' standard of reversible error with regard to capital penalty-trial jury instruction on mitigating evidence).

Eighth Amendment concerns regarding accurate sentencing determinations in capital cases outweigh concerns with finality and the general policy against retrial. Our concern that all mitigating evidence be before the final arbiter of death imbues mitigating evidence with perpetual relevance. Continuing consideration of mitigating evidence is necessary to insure that a death sentence is imposed consistently. Evidence relevant to a death-sentencing proceeding uncovered after a death sentence has been imposed must not, therefore, be dismissed simply because it is belated.

as it supports an inference that "might serve 'as a basis for a sentence less than death.'" *Skipper, supra,* 476 *U.S.* at 4–5, 106 *S.Ct.* at 1671, 90 *L.Ed.*2d at 7 (quoting *Lockett, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990). In *State v. Martini,* 131 *N.J.* 176, 316, 619 *A.*2d 1208 (1993) (*Martini I*), we noted that mitigating evidence serves "(1) to weaken the State's proofs concerning the existence of aggravating factors; (2) to establish the existence of mitigating factors; and (3) to bolster the weight of those mitigating factors found to exist in an attempt to have those factors outweigh the aggravating factors found to exist during the jurors' ultimate deliberation." The evidence before us certainly fits that definition.

My debate with the Court concerns whether the evidence is sufficiently mitigating to require retrial. To be sure, the mere discovery of mitigating evidence does not warrant vacation of a death sentence and a new penalty trial. In most circumstances, the established standard for entitlement to a new trial based on evidence discovered or obtained after trial is strict. To receive a new guilt/innocence trial based on newly discovered evidence, a defendant must demonstrate that the evidence is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981) (remanding for reconsideration of whether newly discovered polygraph evidence required reversal of murder convictions and retrial); *see R.* 3:20–1 (authorizing new trial if there is a manifest denial of justice under the law). The preceding analysis, which focuses on the criteria for determining whether post-trial evidence should be considered, applies here. We ought to consider as an initial matter how the evidence came about, and who was at fault for its late arrival. Under the extraordinary circumstances of this case, we must excuse defendant for keeping the evidence under wraps, and defense counsel for failing to uncover it, to preserve the fair administration of capital punishment and avoid injustice.

We must then consider the materiality and potential effect of the evidence. The general standard, that to support a motion for a new trial newly discovered evidence must be "of the sort that would probably change the jury's verdict," has been applied with equanimity to claims of newly discovered evidence relevant to capital murder convictions. *See State v. Bunk,* 4 *N.J.* 482, 73 *A.*2d 245 (1950) (holding affidavits exculpating co-defendants made after conviction and imposition of death sentence did not require reversal of capital murder convictions and retrial); *State v. Engel,* 249 *N.J.Super.* 336, 402, 592 *A.*2d 572 (App.Div.) (holding discovery of x-rays allegedly revealing a "radio-opaque object" in victim's skull unknown to defense at trial did not require reversal of murder convictions and retrial), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991). The unique context of capital sentencing proceedings, however, demands that ordinary standards of review be held to distinct interpretations.

For example, a *Brady* violation traditionally lies where the prosecution has failed to disclose evidence favorable or mitigating to the defense that was also material. *Moore v. Illinois,* 408 *U.S.* 786, 794–95, 92 *S.Ct.* 2562, 2568, 33 *L.Ed.*2d 706, 713 (1972). Evidence is generally material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985) (plurality opinion); *see id.* at 685, 105 *S.Ct.* at 3385, 87 *L.Ed.*2d at 496 (White, J., concurring). We addressed the materiality of exculpating evidence excluded from a capital sentencing proceeding in *State v. Nelson,* 155 *N.J.* 487, 715 *A.*2d 281 (1998), *cert. denied,* —— *U.S.* ——, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999), and held that undisclosed evidence is material if, when considered by the jury, it is "reasonably probable that an additional juror or jurors would have found the existence of one or more of defendant's mitigating factors" or "that the jury would have given greater weight to the mitigating factor(s) thus substantiated...." *Id.* at 500–01, 715 *A.*2d 281. Finding that to be the case in

*Nelson*, we reversed the defendant's conviction. *Id.* at 501, 715 *A.*2d 281.

With regard to ineffective assistance of counsel in the context of capital sentencing, the Court has redefined the traditional standard for assessing prejudice. In ordinary criminal proceedings, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 *U.S.* 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L.Ed.*2d 674, 698 (1984); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). Pursuant to *Strickland, supra*, when a defendant challenges a death sentence, "the question is whether there is a reasonable probability that absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 *U.S.* at 695, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 698. Recognizing "the profound distinction between our circumscribed appellate-review function and the capital jury's significantly less-restricted role in deciding between life and death," however, we deem it necessary to "adapt" the prejudice prong of the test for ineffective assistance of counsel "to the realistic limitations on appellate review of jury penalty-phase deliberations." *State v. Marshall*, 148 *N.J.* 89, 250, 690 *A.*2d 1 (1997) (*Marshall III* ), *cert. denied*, —— *U.S.* ——, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997); *cf. State v. Davis*, 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989) (declining to adjust *Strickland/Fritz* standard for capital cases in general). Therefore, prejudice is established at the penalty phase of a capital trial if "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Marshall III, supra*, 148 *N.J.* at 250, 690 *A.*2d 1; *see State v. Morton*, 155 *N.J.* 383, 431, 715 *A.*2d 228 (1998). That is, "if a reasonable juror would have considered the material in his or her deliberative process, then vacation of the death sentence is required." *Morton, supra*, 155 *N.J.* at 481, 715 *A.*2d 228 (Handler, J., dissenting); *Marshall III, supra*, 148 *N.J.* at 310–11, 690 *A.*2d 1 (Handler, J., dissenting).

So, too, Eighth and Fourteenth Amendment protections requiring the presentation of all relevant mitigating evidence to the sentencer in a capital trial demand substantial alteration of the standard for newly discovered evidence when the new evidence would be presented as mitigation at the penalty-phase. In light of the foregoing, it follows that in a capital context newly discovered mitigating evidence requires a new sentencing proceeding if it creates an inference that could weigh, in the mind of a reasonable juror, against imposition of the death penalty. If one juror could draw an inference from the evidence that would support a life verdict, then discovery of the new evidence requires vacation of the death sentence.

Given the nature of death penalty sentencing proceedings that will often be the case. A court can hardly ever, perhaps never, legitimately say that mitigating evidence would not lessen a capital defendant's blameworthiness in the mind of at least one sentencing juror. When the evidence is double-edged, determining its mitigating effect is certainly too complex an inquiry to be confidently performed by a court. Evidence that a person is an alcoholic or is inclined to substance abuse, for example, may convey blameworthiness in some respects and yet evoke sympathy, empathy, or simply provide justification in others. When the ultimate issue is whether to put someone to death, it is virtually impossible for a court to determine that evidence that is dual in nature is not mitigating. The dual nature of the mitigating evidence presented by the Public Defender in support of Martini's appeal does not dispel its relevance as mitigation. The mitigating aspect of the evidence is sufficient to create an inference that could weigh in the mind of a reasonable juror against sentencing Martini to death.

## C.

The PCR judge, who presided over defendant's trial as well, based his decision upon his own impressions of the evidence. He also relied upon how he thought the jurors at Martini's trial would

have reacted to the evidence, and, in doing so, drew upon the remarks of two of the jurors who sat at the penalty phase. Those jurors, he concluded, would not have looked upon the evidence as mitigating. "[I]f all of that was presented to the jury," the judge observed, "it probably would have taken them less time to decide for death." [2]

That decision is inappropriately and fatally subjective. The standard by which to assess the impact of newly discovered evidence, be it in a capital sentencing proceeding or otherwise, is objective. It relates to an objectively reasonable juror, not to a particular juror or even to the entire jury in the given case. As in assessing the "prejudice" or "materiality" of other errors, this objective standard neither requires nor permits a court to base its decision upon the views of actual jury members, especially when only some of the jurors have disclosed their views. The PCR court was also mistaken to measure the evidence under a standard of whether the evidence may have changed the mind of one of the jurors. It is plain that, in a capital sentencing context, error need not be outcome-determinative to provide a basis for reversal. *See Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1.

The Court's conclusion regarding the impact of the evidence is flawed in a different respect. The majority determines that "the evidence presents a troubling picture that has some mitigation value mixed with a substantial downside potential," and that "[i]n effect, the usefulness of the evidence as mitigation is seriously

---

[2] The judge elaborated on his reasons for that conclusion:

It would have taken them less time to make a decision. I have no doubt. I selected this jury. I sat with this jury ... I believe attached to the certification of the moving papers was an article where two of the jurors were interviewed, one being the foreperson. I remember the other juror was quoted as saying, "Yes, I had tears in my eyes." I remember the foreperson as being quoted as saying something to the effect, "We knew in our hearts if there was a case for the death penalty this was it," and so they voted. Would this have had a significant impact on their deliberations in that it may have changed any one of their minds? I don't think so at all. I do not think so at all.

undermined by its unfavorable aspects." *Ante* at 261, 734 *A.*2d at 264–65. The Court holds that even if a limiting instruction was given, as this Court requires where mitigating evidence is offered that has a substantial potential to prejudice the defendant, *see State v. Rose,* 112 *N.J.* 454, 503–08, 548 *A.*2d 1058 (1988), the ultimate effect of the evidence would not have been beneficial to defendant. *See ante* at 262, 734 *A.*2d at 265. In short, the majority weighs what it views to be the positive aspects of the evidence with the negative, and finds a preponderance of the latter.

In *Marshall III, supra,* we recognized that "an appellate court cannot predict the outcome of penalty-phase deliberations, [although] it is entirely capable of assessing whether the production of additional mitigating evidence would have been likely to have a substantial effect on the jury's deliberations." 148 *N.J.* at 250–51, 690 *A.*2d 1. Within those parameters, the appellate court should simply ascertain whether the mitigating aspects of the evidence would have altered the deliberations of a reasonable juror. The majority of this Court, concluding that the evidence is double-edged to such an extent that its presentation would likely have harmed more than helped defendant's plea for mercy, exceeds its role. Weighing the evidence is an exercise properly left to the sentencer, be it jury or judge, at a sentencing proceeding. *See Eddings, supra,* 455 *U.S.* at 117, 102 *S.Ct.* at 878, 71 *L.Ed.*2d at 12 ("[T]he state courts [*i.e.,* sentencing judge] must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances. We do not weigh the evidence for them."). As this Court's statement in *Marshall III, supra,* explains, our role is simply to ascertain whether the mitigating aspects of the evidence would have altered the deliberations of a reasonable juror.

Further, although the Court acknowledges that a limiting instruction must accompany rebuttal to the presentation of mitigating evidence, *see Rose, supra,* 112 *N.J.* at 503–08, 548 *A.*2d 1058, it apparently ignores the scope of that requirement. In *Rose,* the

prosecutor responded to a capital defendant's proffer of good character evidence by burying the defendant with character-destroying rebuttal evidence, including incidents of racial bigotry and threats of violence. *Id.* at 499–502, 548 *A.*2d 1058. Noting that "[i]n the penalty phase of a capital case, the function of the jury has been sharply defined by the Legislature," we held that "the jury is not permitted, in its weighing process, to add other evidence of defendant's past conduct to the weight it assigns to the aggravating factors, nor to consider other evidence of defendant's past conduct, except to the extent offered to rebut mitigating factors, as detracting from the weight it assigns to the mitigating factors." *Id.* at 507–08, 548 *A.*2d 1058; *see State v. Mejia,* 141 *N.J.* 475, 505, 662 *A.*2d 308 (1995); *State v. McDougald,* 120 *N.J.* 523, 574, 577 *A.*2d 419 (1990). Moreover, the State may not put forth "a new aggravating factor under the guise of producing rebuttal evidence." *State v. Biegenwald,* 110 *N.J.* 521, 543, 542 *A.*2d 442 (1988). Therefore, despite the potentially aggravating nature of the evidence presently offered by the Public Defender, a sentencing jury would be strictly limited in its consideration.

The Court's reasoning is not justified by the fact that it reached similar decisions in *Marshall III, supra,* and *Morton, supra. See ante* at 261–62, 734 *A.*2d at 264–65. In both *Marshall III* and *Morton,* this Court rejected the defendants' claims of ineffective assistance of counsel despite the failure of defendants' respective counsel to present all mitigating evidence. In each case, the Court claimed that the evidence in question may have harmed the defendant. *See Morton, supra,* 155 *N.J.* at 431–33, 715 *A.*2d 228; *Marshall III, supra,* 148 *N.J.* at 255–56, 690 *A.*2d 1. The Court's basis for these decisions was improper. In a capital sentencing proceeding, evidence that would provide for an inference in the mind of a reasonable juror favorable to defendant must be considered by the jury. Justifying the absence of mitigating evidence and defense counsel's failure to present such evidence on the ground that the evidence may have been harmful to defendant is, I maintain, inconsistent with the federal and State constitutional

requirements that a capital defendant be sentenced by a fully informed penalty-phase jury.

## D.

As a final point, I emphasize that the PCR court and now a majority of this Court minimize the mitigating potential of the evidence by subduing the reports and testimony of two mitigation experts retained by the Public Defender. In support of its claim that the new evidence is mitigating, the Public Defender wished the court to hear Ms. Aviv's and Ms. Nardone's views on how the evidence could have been used to construct a social history for Martini that would have appealed to a penalty phase jury. Both were specialists in mitigation in criminal trials and both had testified at defendant's penalty phase.

Despite this Court's directive in *Martini IV, supra,* ordering the trial court on remand to "hear any further evidence and arguments from the parties," 148 *N.J.* at 453–54, 690 *A.*2d 603, the PCR court refused to consider the experts' testimony or reports. "I don't believe I need the help of an expert," the PCR judge declared, "I've already told what I believe this jury would do and the effect [the evidence] would have had on the deliberations in my opinion. I don't believe I need [the mitigation experts] in deciding that." The judge, nevertheless, suggested to counsel:

Again you may want to address Ms. Nardone's situation and certainly Ms. Aviv's situation assuming there's a new trial as to the penalty situation. I think you already know what my position is on that, but certainly she may help the ordinary citizen in analyzing someone's life history and how the various events have affected them.

Following the court's refusal to hear the testimony of the mitigation experts, the Public Defender requested that the court admit the experts' written reports into evidence. That the judge allowed, noting, however, that he most likely would not read the reports.

The Court determines that the PCR court's treatment of the expert evidence did not constitute an abuse of discretion because the expert reports provide information that is merely cumulative.

*See ante* at 287–88, 734 *A*.2d at 279. I disagree. Cumulative evidence in some contexts may be corroborative. Evidence that is corroborative may be significant when its weight as well as its probative worth can affect the outcome of jury deliberations. In the penalty phase of a capital case, testimony that supports or tends to prove a mitigating factor or add to its weight or disprove or weaken an aggravating factor is relevant and admissible. *See, e.g., State v. Bey*, 129 *N.J.* 557, 586–87, 610 *A*.2d 814 (1992) (*Bey III* ) (holding State psychologist's diagnosis of defendant's personality disorder and upbringing relevant to alleged mitigating factors of mental or emotional disturbance and mental defect or intoxication). Testimony by mitigation experts, for instance, psychologists or social workers, is particularly important at the penalty phase of a capital trial; it may add to the weight of existing mitigating evidence. As I explained in *Morton, supra:*

> The testimony of a mitigation expert could have affected the penalty-phase deliberations. The expert witness would have explained to the jury how defendant's difficult childhood or low intelligence or defendant's mother's irresponsible child rearing impacted on defendant's deathworthiness. Without the testimony of a mitigation expert, the mitigating evidence was obscure and devoid of context.
>
> [155 *N.J.* at 481–82, 715 *A*.2d 228 (Handler, J., dissenting).]

Although Martini's case is a post-conviction rather than penalty trial, the preceding considerations are equally applicable here. As in a penalty-phase trial, the mitigating nature of the evidence is directly at issue in this case. Therefore, the PCR court erred by refusing to consider the expert testimony.

The State argues that the prejudice caused by failure to admit the experts' testimony was cured by the court's subsequent decision to admit the written reports of Nardone and Aviv into evidence pursuant to *Rule* 1:7–3. The State correctly notes that a petition for post-conviction relief may be determined on the papers without oral testimony. *See State v. Flores*, 228 *N.J.Super.* 586, 589–90, 550 *A*.2d 752 (App.Div.1988), *certif. denied*, 115 *N.J.* 78, 556 *A*.2d 1220 (1989); *R.* 3:22–11. Because the content of the reports in this case likely mirrors the content of the experts' proposed testimony, the court's decision to bar the testimony was

not clearly capable of producing an unjust result. *R.* 2:10–2. The PCR judge, however, admitted the experts' reports with the qualifying statement that he most likely would not read them. The Court may not treat that concession by the lower court dismissively, as so much badinage. If the PCR court did not read the reports, then the State's argument fails because the PCR court completely ignored the expert mitigation testimony in making his decision. Omission of the evidence, therefore, compromised the fairness of the post-conviction proceedings and the integrity of the judge's decision. The Court should recognize, as the PCR court did, that the expert testimony would have substantial impact at a new sentencing trial.

In sum, the petition for post-conviction relief must be granted, and defendant's death sentence must be vacated. We cannot be confident of a death sentence where evidence that could have affected at least one juror's deliberations concerning defendant's sentence was not introduced to the jury, much less considered for that purpose.

## II

The Public Defender claims that Martini was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the federal Constitution and Article I, paragraph 10 of the State Constitution because Martini's appointed trial counsel failed to investigate avenues that would have led to discovery of the evidence now before the Court and use the potential fruits of such an investigation at the penalty phase of Martini's trial.

Ineffective assistance of counsel claims require that a defendant show both deficient performance by counsel and resultant prejudice. *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. Prejudice is manifest when errors by counsel deprive the defendant of a fair and reliable trial. *See Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 697–98. With regard to

capital penalty-phase proceedings, this Court recognizes that a defendant is prejudiced by counsel's performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty phase deliberations would have been affected substantially." *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1. In other words, "if a reasonable juror would have considered the material in his or her deliberative process, then vacation of the death sentence is required." *Morton, supra,* 155 *N.J.* at 481, 715 *A.*2d 228 (Handler, J., dissenting); *Marshall III, supra,* 148 *N.J.* at 310–11, 690 *A.*2d 1 (Handler, J., dissenting). The evidence proffered by the Public Defender meets that standard. *See* discussion *supra* at 286–88, 734 *A.*2d at 278–79. Indeed, the State concedes: "[o]bviously, if the evidence [ ] had been introduced at the penalty phase, the jury's deliberations would have been radically different, thus satisfying the *Marshall III* standard of whether 'deliberations would have been affected substantially.' "

Whether or not trial counsel's representation was deficient is a more involved issue. Legal representation is deficient if it falls below an objective standard of reasonableness. *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693; *Marshall III, supra,* 148 *N.J.* at 156–57, 690 *A.*2d 1. As noted previously, the Court has adopted a unique standard of prejudice for the penalty-phase of capital cases. I maintain that "the profound difference between capital and noncapital criminal prosecutions compels, as a matter of state constitutional law, the adoption of an enhanced standard for which to measure the competence of counsel" as well. *Davis, supra,* 116 *N.J.* at 413, 561 *A.*2d 1082 (Handler, J., dissenting in part and concurring in part).

> We must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner. Most particularly, counsel should exhibit this level of competence in the sentencing phase of a capital murder prosecution.
>
> [*Ibid.*]

*See Marshall III, supra,* 148 *N.J.* at 311, 690 *A.*2d 1 (Handler, J., dissenting); *State v. Savage,* 120 *N.J.* 594, 644, 577 *A.*2d 455 (1990)

(Handler, J., concurring in part and dissenting in part); *State v. Oglesby*, 122 *N.J.* 522, 544–45, 585 *A.*2d 916 (1991) (Handler, J., concurring).

Martini's defense counsel failed to exhibit this heightened level of competence in two respects: trial counsel failed to adequately investigate mitigating evidence; and, consequently, trial counsel failed to present the jury with the information necessary to make an individualized sentencing determination. "The failure to investigate, assemble, and present mitigating evidence is the most basic form of ineffectiveness of capital counsel." *Marshall III, supra*, 148 *N.J.* at 322, 690 *A.*2d 1 (Handler, J., dissenting).

This Court has recognized that the "critical element" of representation in the penalty phase of capital trials is investigation. *See Savage, supra*, 120 *N.J.* at 625, 577 *A.*2d 455. Defense counsel has a duty to conduct "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 618, 577 *A.*2d 455 (quoting *Strickland, supra*, 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Where "counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is 'virtually unchallengeable.'" *Id.* at 617, 577 *A.*2d 455 (quoting *Strickland, supra*, 466 *U.S.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 695); *see Burger v. Kemp*, 483 *U.S.* 776, 791, 107 *S.Ct.* 3114, 3124, 97 *L.Ed.*2d 638, 655 (1987) (holding that after conducting interviews and consulting psychiatric reports regarding defendant's history, attorney's choice not to present such evidence as mitigation was a "reasonable decision"). Although "clairvoyance is not required," *Dooley v. Petsock*, 816 *F.*2d 885, 890–91 (3d Cir.), *cert. denied*, 484 *U.S.* 863, 108 *S.Ct.* 182, 98 *L.Ed.*2d 135 (1987), a strategic choice by an attorney not to inquire into critical, mitigating facts is not reasonable, *see Savage, supra*, 120 *N.J.* at 625, 577 *A.*2d 455.

In *Savage*, for example, an attorney represented a client who had a history of psychiatric problems. Rather than pursue a mental incapacity defense, the attorney decided to present a reasonable doubt defense. *Id.* at 607, 577 *A.*2d 455. Trial counsel

did not submit his client to a psychiatric examination and did not investigate the client's psychiatric history. This Court held that while counsel's choice not to pursue a psychiatric defense could have been a "a legitimate tactical decision," it was not adequate under the circumstances. *Id.* at 621–22, 577 *A.2d* 455. In the Court's view, "defense counsel failed thoroughly to consider the soundness of his own strategy and was thus unable to conclude that he was pursuing a plausible defense." *Ibid.* In short, counsel's failure to investigate "rob[bed]" his trial strategy of "any presumption of ·competence." *Id.* at 622, 577 *A.2d* 455 (quoting *Davis, supra,* 116 *N.J.* at 357, 561 *A.2d* 1082); *see id.* at 625, 577 *A.2d* 455; *id.* at 644, 577 *A.2d* 455 (Handler, J., concurring in part and dissenting in part) (holding failure to investigate and lack of preparation supported *presumption* of prejudice).

In the present case, the PCR court found that nothing in counsel's files indicated trial counsel were ineffective for failing to investigate or uncover the evidence, and concluded that any deficiency in counsel's performance was marginal. Counsel, the court further believed, "were stopped by Mr. Martini." As such, no amount of investigative effort would have sufficed, and a strategic choice by counsel not to pursue an investigation that would have uncovered the evidence now before the Court would have been reasonable. Further, in the PCR court's view, counsel's failure to present the evidence was not deficient because the effect on the jury would have been gravely detrimental rather than beneficial to defendant. Even if trial counsel had possessed the evidence, the attorneys would not, in the PCR court's view, have acted unprofessionally by not introducing the evidence because they had a reasonable basis for such a strategic decision.

The Court shares these views. *See ante* at 290–92, 734 *A.2d* at 281–82. I disagree. Counsel's failure to investigate cannot be excused as a reasonable tactical choice. As *Savage* suggests, only a complete lack of knowledge can excuse failure to investigate potentially mitigating evidence in a capital case. As reasonable as trial counsel's conclusion may ultimately have been, it does not

relinquish their responsibility to investigate. Because trial counsel were given clues that established knowledge on their part sufficient to warrant such investigation, the failure to do so was unreasonable, and the representation deficient. The fact that the evidence was not presented at the sentencing proceeding compounds the deficiency—failure to present all relevant mitigating evidence at a penalty-phase trial is patently unreasonable. *See Morton, supra,* 155 *N.J.* at 475–80, 715 *A.*2d 228 (Handler, J., dissenting); *Marshall III, supra,* 148 *N.J.* at 313–15, 318–24, 690 *A.*2d 1 (Handler, J., dissenting). Defense counsel may not be excused by defendant's non-disclosure in these circumstances. *Cf. Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2061, 80 *L. Ed.*2d at 695–96. In a situation such as this, given ample clues, counsel should have recognized defendant's situation, presented the dilemma to the court, and moved for a life sentence. At least, trial counsel should have sought presentation of the evidence in an *in camera* proceeding, as the Public Defender is doing now. *See* discussion *infra* at 301–05, 734 *A.*2d at 287–89.

Even if trial counsel's level of knowledge was sufficiently inchoate or fragmentary to explain their failure as individuals to act upon it, ineffective assistance of counsel can be ascribed on a broader basis. Effective assistance of counsel may be an institutional obligation. We do not hesitate to impute knowledge to institutional bodies in similar contexts. We dealt with such an issue recently in the context of a *Brady* violation in *Nelson, supra,* 155 *N.J.* 487, 715 *A.*2d 281. In *Nelson,* one of the mitigating factors urged by the defendant was that the police had been inadequately trained to deal with an individual like Nelson, who was distraught and violent. The defendant claimed that because she suffered exaggerated fears and delusions, she attacked and killed the threatening police officers. *Id.* at 494–95, 715 *A.*2d 281. One of the surviving officers brought a civil complaint against the police department for failure to train police in confronting such persons, and served the complaint on the prosecutor's office during Nelson's capital-murder trial; the complaint was not, how-

ever, brought to the personal attention of the prosecuting attorney. *Id.* at 496–97, 715 *A.*2d 281. The allegations set forth in that complaint supported the defendant's defense. This Court found, in accordance with substantial *Brady* precedent, that the prosecutor's office bore an institutional responsibility to advise the defense of the officer's suit as exculpatory *Brady* material. *Id.* at 501, 715 *A.*2d 281.

The Public Defender's nondelegable responsibility for a capital defendant's defense and its overall control of Martini's trial counsel in this case put the Office in a quasi-supervisory role. Therefore, a claim of ineffective assistance of counsel could. lie against the Office of the Public Defender itself. Martini's original trial counsel was a public defender. Original trial counsel resigned shortly after he began to represent Martini, and when he did so the Office of the Public Defender dropped the case as well. The Office of the Public Defender, however, kept original trial counsel's notes on file. Soon thereafter, the court appointed new counsel for Martini, and ordered the Office of the Public Defender to compensate new counsel and provide ancillary services for Martini. The record shows that after original trial counsel and the Office of the Public Defender officially withdrew from the case, an Assistant Public Defender, who was familiar with the original trial counsel's files, continued to be involved in the case as a liaison between the Office of the Public Defender's and newly appointed counsel. Memoranda from the Assistant Public Defender to the new trial counsel demonstrate that the Public Defender engaged not only in authorizing payment, but also in giving counsel substantive legal advice. In fact, the PCR court suggested that trial counsel's failure to investigate, discover, or use the evidence in Martini's defense was due in part to a strategic decision by the Assistant Public Defender. Because the Assistant Public Defender remained involved in Martini's representation after the case was reassigned to trial counsel, the Office of the Public Defender may not disclaim institutional responsibility in assuring defendant effective assistance of counsel.

The next question is whether the Assistant Public Defender's performance could be deemed deficient. The Assistant Public Defender had original trial counsel's notes on file. Those notes contained information that would have provided reason to conduct an investigation that may have led to the mitigating evidence at issue. The Assistant Public Defender did not give the file to trial counsel, or even notify them of its existence. In the PCR court's view, the Assistant Public Defender made a strategic decision to try to bury the information on file because he believed it would prejudice Martini. Regardless, the Public Defender had a duty to turn over that information. The fact that neither the Assistant Public Defender nor anyone else in the Office of the Public Defender's turned the materials over to trial counsel constitutes deficient performance of counsel. The omission of the evidence from defendant's sentencing trial was highly prejudicial. An ineffective assistance of counsel claim therefore holds, on an institutional level, against the Office of the Public Defender.[3]

## III

Ordinarily, a finding of ineffective assistance of counsel at the penalty-phase of a capital trial would be grounds to vacate a defendant's death sentence. Likewise, a finding that newly dis-

---

[3] Martini argues that the Public Defender is currently providing ineffective assistance by pursuing this appeal. Defendant claims the Public Defender's alleged "representation" violates his constitutional rights. Martini argues that his admissions of guilt and his concession that his sentence was correct should close the debate. He also contends there is a violation of the attorney-client privilege. Further, compelling an unwilling defendant to accept legal counsel, he claims, violates his Sixth Amendment right to self-representation. In addition, according to Martini, the Public Defender's conduct violates several Rules of Professional Conduct. We addressed related issues in *State v. Martini*, 144 *N.J.* 603, 677 A.2d 1106 (1996) (*Martini III*), and determined that the Public Defender could properly pursue PCR on defendant's behalf. Moreover, the undertaking by the Public Defender in this case, even over the objections of Martini, is necessary to furthering the *State's* interest in assuring the fair, just and reliable imposition of a death sentence. *Infra* at 301–05, 734 A.2d at 287–89.

covered mitigating evidence would have substantially affected the jury deliberations should lead, in most circumstances, to a new sentencing proceeding at which the omitted evidence would be taken into account.

In this case, however, defendant has a legitimate and protectable interest in keeping the evidence confidential, which complicates the matter. Because under the circumstances a fair and individualized sentencing proceeding before a fully informed jury must include the mitigating evidence in question, defendant's interest in a fair and individualized sentencing proceeding cannot simultaneously be protected and reconciled with his interest in confidentiality. Faced with this paradox, defendant, preferring to maintain strict confidentiality of the evidence, has chosen to forego a comprehensive sentencing proceeding. In essence, defendant seeks to preserve his confidentiality interest by waiving his right to present mitigating evidence, and his right to appeal. Defendant should not, however, have been put to that Hobson's choice.

In light of the fact that defendant is entitled to a new trial, we must consider whether a new trial could be conducted under conditions, perhaps *in camera*, that would allow full effect to be given to all of defendant's rights and interests. If not, the State must abandon its effort to impose the death penalty on defendant.

## A.

The Public Defender urges that defendant's interest in a fair and individualized sentencing proceeding may be given full effect along with his confidentiality interest if a new sentencing proceeding was conducted, at least partially, *in camera*. We asked the PCR court to consider the efficacy of protecting defendant's confidentiality interest in a penalty-phase proceeding by

> imposing conditions on the admission of the evidence, such as *in camera* proceedings, redaction of information, or the presentation of the evidence through summarization or paraphrasing in a form that will eliminate the concerns for confidentiality.

[*Martini IV, supra,* 148 *N.J.* at 454, 690 *A.*2d 603.]

The PCR court responded that the entire penalty phase would have to be closed. The Court does not reach this issue. *See ante* at 271 n. 6, 734 *A.*2d at 270 n. 6. Because I believe that defendant's death sentence should be vacated, I must consider whether closed proceedings would be an adequate solution to the intricate and importunate constitutional demands presented by this case. I conclude that the *in camera* presentation of mitigating evidence would be constitutionally inadequate, in this or any capital penalty-phase trial.

Closing the courtroom of a criminal proceeding infringes upon a defendant's right to a fair and public trial. *See Waller v. Georgia,* 467 *U.S.* 39, 47–48, 104 *S.Ct.* 2210, 2216, 81 *L.Ed.*2d 31, 39–40 (1984); *Gannett Co. v. DePasquale,* 443 *U.S.* 368, 99 *S.Ct.* 2898, 61 *L.Ed.*2d 608 (1979); *see also Duncan v. Louisiana,* 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.*2d 491 (1968) (extending Sixth Amendment right of trial by jury to all state criminal proceedings through Fourteenth Amendment); *Irvin v. Dowd,* 366 *U.S.* 717, 81 *S.Ct.* 1639, 6 *L.Ed.*2d 751 (1961) (holding fair and impartial jury in state criminal proceedings required by due process clause of Fourteenth Amendment). "[O]ne of the most important means of assuring a fair trial is that the process be open to neutral observers." *Press–Enterprise Co. v. Superior Court of California,* 478 *U.S.* 1, 7, 106 *S.Ct.* 2735, 2739, 92 *L.Ed.*2d 1, 9 (1986) (*Press–Enterprise II* ). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned. . . ." *In re Oliver,* 333 *U.S.* 257, 270 n. 25, 68 *S.Ct.* 499, 506 n. 25, 92 *L.Ed.* 682, 692–93 n. 25 (1948); *see Waller, supra,* 467 *U.S.* at 46, 104 *S.Ct.* at 2215, 81 *L.Ed.*2d at 38; *Gannett, supra,* 443 *U.S.* at 380, 99 *S.Ct.* at 2905, 61 *L.Ed.*2d at 622.

With regard to the presentation of mitigating evidence at a capital sentencing proceeding, the right of a criminal defendant to a fair and public trial, rooted in the Sixth and Fourteenth Amendments, harmonizes with the Eighth and Fourteenth Amendment bar to cruel and unusual punishment. Like the right to a public

trial, the ban on cruel and unusual punishment demands public scrutiny. That would be absent from a penalty-phase trial closed for the presentation of mitigating evidence. To authorize such veiled proceedings, and respect a death sentence derived therefrom, would bring us precariously close to a practice of off-the-record convictions and secret executions, which the Eighth and Fourteenth Amendment were intended to prevent.

Given the high level of public accountability and responsiveness required for the implementation of a valid death sentence, the presentation of mitigating evidence in a capital penalty trial cannot, consistently with constitutional imperatives, be conducted *in camera*.[4]

## B.

If a closed penalty trial is not possible, and defendant's confidentiality interest prevents disclosure of the evidence in open court, two options apparently remain: allow defendant to waive his right to a new penalty trial, remain sentenced to death, and proceed to his execution; or prohibit defendant from being prosecuted capitally, to remain in prison for the rest of his life.

---

[4] Closing the courtroom would also impair the First Amendment right of access held by both the public and the press to attend criminal proceedings. *See Press–Enterprise II, supra*, 478 *U.S.* at 14, 106 *S.Ct.* at 2743, 92 *L.Ed.*2d at 13–14; *Globe Newspaper Co. v. Superior Court*, 457 *U.S.* 596, 606–07, 102 *S.Ct.* 2613, 2620, 73 *L.Ed.*2d 248, 257 (1982); *Richmond Newspapers v. Virginia*, 448 *U.S.* 555, 580, 100 *S.Ct.* 2814, 2829, 65 *L.Ed.*2d 973, 992 (1980); *Application of VV Pub. Corp.*, 120 *N.J.* 508, 514, 577 *A.2d* 412 (1990). Nevertheless, the public's right to access to criminal trials will give way "in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller, supra*, 467 *U.S.* at 45, 104 *S.Ct.* at 2215, 81 *L.Ed.*2d at 38; *see State v. Williams*, 93 *N.J.* 39, 63, 70, 459 *A.*2d 641 (1983); *see also State v. Marshall*, 199 *N.J.Super.* 502, 489 *A.2d* 1235 (App.Div.1985). The presence of these First Amendment rights only reinforces my conclusion that capital sentencing trials are distinct from other capital proceedings and that, given the rights at stake, the presentation of mitigating evidence in such proceedings may never be *in camera*.

To allow defendant to forego a new penalty trial would allow him essentially to waive his right to present mitigating evidence in a capital sentencing proceeding as well as his right to appeal. Those rights are not the exclusive domain of the defendant. They are expressive of the public's interest in the reliability and fair administration of capital punishment. The State has a profound and unshakable interest in death sentences that are reliable and meted out justly and fairly. We have previously held that the policy reasons that undergird that overarching public interest prohibit a capital defendant from waiving the right to present mitigating evidence in a capital sentencing proceeding, *see Hightower, supra,* 120 *N.J.* at 415, 577 *A.*2d 99; *Koedatich II, supra,* 112 *N.J.* at 329–30, 548 *A.*2d 939, or the right to appeal a death sentence, *see State v. Koedatich,* 98 *N.J.* 553, 489 *A.*2d 659 (1984) (*Koedatich I* ). That public interest, as we held specifically regarding defendant's case, prohibits a capital defendant from waiving his right to post-conviction review. *See Martini III, supra,* 144 *N.J.* at 607, 677 *A.*2d 1106. This is the first time the Court has considered waiver of a capital penalty trial or the right to present mitigating evidence therein that was motivated by defendant's exercise of another protectable interest—namely, defendant's desire to keep the evidence confidential.

Whether defendant's confidentiality interest demands special treatment or presents grounds for an exception to the otherwise absolute and non-waivable rights discussed in *Koedatich I* and *II* and *Hightower* is not a question that need be reached to arrive at a fair, just, and constitutional solution to the problem in the present case. It should be clear that the Court's opinion in this case does not make or endorse an exception to the rules, enunciated in *Koedatich* and *Hightower,* that "under our law a defendant may not waive a sentencing hearing, may not waive the presentation of mitigating evidence, and may not waive an appeal," *Martini III,* 144 *N.J.* at 609, 677 *A.*2d 1106. Unimpressed with the evidence put forth by the Public Defender, the Court has simply avoided the issue. *See ante* at 271, 734 *A.*2d at 270 (noting that the Court "need not decide whether defendant's confidentiality

interest alone is sufficient to exclude the evidence at a new penalty-phase trial").

Where a defendant is being forced to choose between sacrificing rights, the issue of whether the defendant, having made the choice between the lesser of two sacrifices, can waive some of those rights over others is beside the point. The crux of the matter is that any waiver under circumstances such as these is involuntary and beyond the pale of constitutional principles. *See Commonwealth v. McKenna,* 476 *Pa.* 428, 383 *A.*2d 174, 181 (1978) ("The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing a state to conduct an illegal execution of a citizen."); *People v. Stanworth,* 71 *Cal.*2d 820, 80 *Cal.Rptr.* 49, 457 *P.*2d 889, 899 (1969) ("The law cannot suffer the state's interest and concern in the observance and enforcement of this policy [that in favor of capital appeals] to be thwarted through the guise of waiver of a personal right by an individual."). The truth is, Martini, abetted by the State, has been *forced* to choose between sacrificing rights. It is doubtful that Martini truly wants to be killed by lethal injection. Rather, he wants to prevent disclosure of the evidence, and has been forced to bargain his life for that end. The State may not participate in that bargain.

The Court deceptively suggests that no one is forcing defendant. It points out that it is Martini who is insisting on confidentiality and insinuates that it is Martini's confidentiality interest that creates the dilemma, a predicament of his own choosing. The Court, however, does not suggest—and would not dare intimate— that defendant's need for confidentiality is shallow, pretextual or capricious. Defendant's claim of confidentiality is not a flippant claim borne of convenience or whimsy. It is based on solid reasons and implies more than an interest in confidentiality that is solely personal. Indeed, it is fair to say, and in the circumstances should be emphasized, that the State has a strong interest in protecting defendant's confidentiality interest because that is the just and humane thing to do. Further, the State has a parallel

and equally compelling basis for assuring confidentiality—the public interest and its overarching responsibility in protecting all of its citizens.

"[T]he Eighth Amendment not only protects the right of individuals not to be victims of cruel and unusual punishment, [it] also expresses a fundamental interest of society in ensuring that state authority is not used to administer barbaric punishments." *Gilmore v. Utah*, 429 *U.S.* 1012, 1019, 97 *S.Ct.* 436, 440, 50 *L.Ed.*2d 632, 636 (1976) (Marshall, J., dissenting from termination of stay of execution). Criminal justice is administered by the State. The State alone may seek and secure a death sentence; the defendant may not seize the initiative in determining whether he is to be put to death. It is the State's duty in vindicating societal interests to ensure that the death penalty is imposed with respect for human dignity, that is, decently and consistently. *See Furman, supra,* 408 *U.S.* at 274–79, 92 *S.Ct.* at 2744–47, 33 *L.Ed.*2d at 369–72 (1972) (Brennan, J., concurring); *id.* at 309–10, 92 *S.Ct.* at 2762–63, 33 *L.Ed.*2d at 390 (Stewart, J., concurring); *Ramseur, supra,* 106 *N.J.* at 169, 190, 524 *A.*2d 188. To procure a death sentence by placing a defendant in an insoluble and precarious conundrum does not achieve that aim. Justice Marshall's reprimand of the Supreme Court reverberates and is equally applicable to this Court's holding today:

This Court's toleration of the death penalty has depended on its assumption that the penalty will be imposed only after a painstaking review of aggravating and mitigating factors. In this case, that assumption has proved demonstrably false. Instead, the Court has permitted the State's mechanism of execution to be [resolved] by an entirely arbitrary factor: the defendant's decision to acquiesce in his own death.

[*Lenhard v. Wolff,* 444 *U.S.* 807, 815, 100 *S.Ct.* 29, 33, 62 *L.Ed.*2d 20, 23–24 (1979) (mem.) (Marshall, J., dissenting from denial of stay of execution).]

The State cannot proceed by tying the hands of the defendant. The State's insistence on the validity of defendant's death sentence in the circumstances is dishonorable. The State's position that if the evidence were considered mitigating and a new trial required the evidence would have to be presented in open court is cruel. The State would force Martini to produce and expose the

evidence or forsake it, either way at his own risk and peril. A capital prosecution and death sentence carried out under these circumstances, that puts a defendant on a procedural rack, is lacking in the principles of human dignity and due process of law that mark our civilization. Such an execution would indeed be a "barbaric punishment" shorn of the vestiges of fairness, and would be nothing short of savage and sinister.

## IV

The same reasons that lead to the conclusion that a defendant cannot be prosecuted capitally where mitigating evidence cannot be used because confidentiality interests preclude its use, also lead to the conclusion that if those considerations prevent a defendant from availing himself of defenses constitutionally required, *i.e.*, ineffective assistance of counsel or *Brady* claims, due to confidentiality, then the State should not be allowed to proceed with a death penalty prosecution. Such is the case with the *Brady* claim raised by the Public Defender in this case.

## V

Capital prosecutions cannot be mounted in any case without regard to their constitutional, institutional and societal costs. The newly discovered evidence before the Court entitles defendant to a new penalty trial. But the exactions of prosecuting defendant—either without mitigating evidence or in secret—profoundly and irreparably compromise the fair administration of criminal justice. Those exactions are prohibitive, and must impel the State to desist from the continued capital prosecution of defendant.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal*—Justice HANDLER—1.