**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3330-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH M. PALLIPURATH,
a/k/a SANISH,

     Defendant-Appellant.

_____

Argued June 1, 2021 – Decided September 7, 2021

Before Judges Messano and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 09-03-0377.

John Vincent Saykanic, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Vincent Saykanic, on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the briefs).

Appellant filed pro se supplement briefs.

PER CURIAM

Defendant Joseph M. Pallipurath appeals the denial of his petition for post-conviction relief (PCR) without an evidentiary hearing. We place the issues presented on appeal in proper context by referencing our prior opinion. State v. Pallipurath, No. A-5491-11 (App. Div. March 11, 2016).[1]

A jury found defendant guilty of the first-degree murder of Reshma James; the first-degree murder of Dennis John Malloosseril; the attempted murder of Silvy Perincheril; and related weapons offenses. As to each murder count, the grand jury had charged two aggravating factors, specifically that defendant committed the murder while engaged in the commission of, or flight from, the other murder or the attempted murder of Silvy.[2] See N.J.S.A. 2C:11-3(b)(4)(g). The jury found that the State proved the aggravating factors as to each murder beyond a reasonable doubt. Pallipurath, slip op. at 1–2. The judge sentenced defendant to consecutive life terms without parole for the two murders, plus a

_____

[1] The Supreme Court denied defendant's petition for certification. State v. Pallipurath, 228 N.J. 453 (2016).

[2] As we did in our prior opinion, we use the first names of the victims because that is how the witnesses at trial referred to them. We intend no disrespect by this informality.

consecutive twenty-year term with an eighty-five percent period of parole ineligibility on the attempted murder. He imposed concurrent sentences on the remaining counts and ordered restitution of more than $42,000. Id. at 2. We affirmed defendant's convictions and the sentences imposed, except for the restitution ordered by the judge. Id. at 5. We remanded the matter to the trial court to conduct a hearing on the issue of restitution. Id. at 5–6.

The evidence at trial demonstrated that

> [a]t approximately 11:45 a.m. on November 23, 2008, defendant entered Saint Thomas Syrian Orthodox Church in Clifton and shot and killed Reshma, his wife, and Dennis John. Silvy, Reshma's cousin, was also shot, but she survived and is now partially paralyzed. At trial, these facts were undisputed. The issue was whether defendant's conduct was purposeful or knowing, as the State argued, or, committed in the heat of passion or by accident, as defendant contended.
>
> [Id. at 6.]

The State's proofs were substantial and included Silvy's testimony and the eyewitness testimony of others at the church. "Other evidence, some obtained as a result of communications data warrants, supported the State's contention that defendant had travelled cross-country from his home in California, stalked his wife and carried out a pre-planned attack when she would not return to him."

Id. at 7. Defendant provided two statements to law enforcement after fleeing to Georgia. Ibid.

Defendant testified at trial and confirmed "that he had previously physically assaulted his wife." Id. at 8. Defendant admitted that he

> created an email address and pretended to be a mutual friend. Reshma fell for the ruse and confided that she did not want to be with defendant. Defendant admitted he often responded to such statements "in a threatening manner," claiming he was "dangerous," in an effort to scare Reshma and have her return.
>
> [Ibid.]

Defendant also "admitted bringing two guns with him from California and purchasing fifty rounds of ammunition in Wyoming. For approximately three weeks prior to the shootings, defendant surveilled Reshma, observing her attending church on at least two occasions." Ibid. Defendant's description at trial of the events at the church on the day of the shooting "significantly differed from the account defendant provided to authorities in Georgia." Id. at 8–9.

In June 2016, defendant filed a pro se PCR petition that raised several allegations of ineffective assistance of his trial counsel, including that counsel: failed to pursue an insanity or diminished capacity defense; failed to investigate and prepare adequately for trial; failed to consult adequately with defendant; failed to investigate defendant's "mental and emotional status" before the crimes,

4

during their commission, and thereafter, including "during the trial"; failed to provide defendant's psychiatrist with complete mental health records and present him as an expert witness at trial; advised defendant to lie about his mental illness; and called defendant as a witness "against his will," despite knowing of defendant's "poor mental health."

PCR counsel, who now also represents defendant on appeal, conducted an extensive investigation of these allegations and assembled a significant amount of material that was submitted to the PCR judge, who was not the trial judge.

I.

The record before the PCR judge demonstrated the following. Shortly after defendant's 2008 arrest, he attempted suicide and was institutionalized briefly at the Ann Klein Forensic Center. The clinical psychiatrist who treated defendant there diagnosed him with "major depressive disorder recurrent severe with psychotic features." After his retention in 2009, and over the course of the first eighteen months of his representation, trial counsel investigated and pursued potential mental illness-related defenses on defendant's behalf. Among other things, he obtained mental health records from Dr. David M. Cordosi, a clinical psychologist who treated defendant for what appears to have been three sessions in California in September 2008. Dr. Cordosi reported that defendant

5

acknowledged being separated from his wife after having abused her and denied any history of depression, mania, anxiety, or psychosis and did not "endorse any suicidal or homicidal ideation."

On May 14, 2009, trial counsel wrote to the Office of the Public Defender (OPD), requesting that it pay for "the expert services of a psychiatrist and a psychologist." OPD requested that trial counsel provide discovery, defendant's version of events, an estimate of costs for the services requested, and an explanation as to why both a psychiatrist and psychologist were needed. Trial counsel provided the discovery, withdrew the request for a psychologist, and again requested that OPD provide a list of previously approved psychiatrists. OPD denied the request, stating that without further information from defendant, the discovery "reveal[ed] a rational, coherent, culturally-driven . . . attempt by [defendant] to compel his wife to return to him by deadly force, the use of that force in a fit of rage when his plan was frustrated, disposal of the weapon, and a sophisticated flight out-of-state designed to mislead authorities."

On July 20, 2009, trial counsel apprised the court of his efforts to obtain an expert through OPD, noting he intended "to continue to move forward and have an expert evaluate [defendant]." Counsel added, "perhaps the most viable option for the defense is an insanity defense," but that "psychiatric issues . . .

A-3330-18

have to be evaluated and assessed."  Before the judge in August 2009, trial counsel said he was "considering putting forth an insanity defense" and was in the process of seeking an evaluation from an expert approved by OPD.

In November 2009, trial counsel again wrote to OPD, now detailing defendant's version of events, which counsel described as a "psychotic break" triggered by defendant's "delusion that his wife had been kidnapped and was being held against her will."  Counsel requested that OPD pay for the services of a psychiatrist, Dr. Robert T. Latimer.  OPD approved the evaluation, but advised counsel that if there were need for testimony from Dr. Latimer, trial counsel needed to secure additional written authorization from OPD.

Dr. Latimer examined defendant shortly thereafter, but, on February 22, 2010, trial counsel apprised the court that there needed to be a second evaluation. Counsel needed additional psychiatric and hospitalization records from India, where defendant had been treated and hospitalized in the 1990s.  A jail record from March 2010 reflects defendant's complaint that he was not receiving his medications — which, at the time included Benadryl, Effexor, Zyprexa, and Trazadone — on the days he was going to court.  Defendant also reported to the jail clinician "ruminating thoughts" on multiple occasions.

7

At the next status conference, in April 2010, trial counsel represented that he had just received "a wealth of documents" and had "culled through most of them," but still needed to "contact some people in India," and "send out some releases." Counsel represented he would send the records to Dr. Latimer and anticipated having his report within a short time, as "[h]e's already evaluated [defendant] so he's in the very final stages of making a diagnosis."

On April 22, 2010, Dr. Latimer wrote trial counsel stating that he was not able to submit a report until he received information concerning defendant's "conduct disorder" diagnosis related to defendant's prior medical treatment, including hospitalizations in India in 1994 and again in 1998. Dr. Latimer also requested that trial counsel provide him with records from Dr. Cordosi. Noting "[i]t is clear that the acts described which took place on [November 23, 2008] are extremely bizarre and unusual," Dr. Latimer said he was "looking for a scientific explanation which would convince a jury of [defendant's] mental illness as it respects to knowledge, purpose, or wrongfulness." Noting his attempts to talk to trial counsel without success, Dr. Latimer wrote that "the ball [was] on the other side of the court."

In a May 24, 2010 letter, Dr. Latimer again wrote to trial counsel, explaining that he needed more records, specifically juvenile records from

defendant's 1995 arrest for a domestic violence incident involving his mother, treatment records from an Indian psychiatric hospital to which defendant was committed in 1999, and records from the psychiatric treatment defendant received from Dr. Cordosi in 2008. Dr. Latimer noted that defendant "was psychotic" in late 2008, which created "a strong inference that on [November 23, 2008] he was mentally ill, which could explain his alleged dissociative state, as he related it to me." He added, "[t]his case could have a viable defense if we document his life's context," but that he "cannot just take [defendant's] word for his subjective symptoms of psychosis." The case "hinges on the documents that I need," and "if there were preexisting records" supporting defendant's claims of psychosis, "the puzzle might make sense to a [j]ury."

Also, on May 24, 2010, trial counsel appeared before the judge, explained that he had "talk[ed] about the case at length" with Dr. Latimer and had provided him with extra documents needed for his review. The judge gave counsel until June 28, 2010, for Dr. Latimer to submit an expert report and subsequently extended the deadline to July 16, 2010.

On July 26, 2010, Dr. Latimer wrote trial counsel that defendant was "coherent," "lucid," and "very intelligent." He diagnosed defendant with "Major Depressive Disorder, severe, with psychosis . . . in partial remission." Dr.

Latimer added, "[t]he diagnostic classification of this patient is done by the patient's description of his clinical symptoms," and that "for forensic purposes, the opinions of this [e]xaminer need further documentation, as indicated in previous communications." "If the complaints and symptoms of this patient are true," then defendant's "actions of [November 23, 2008] were the result of a mental disorder," but "[i]ssues of insanity at the time of the offenses remain pending future investigative clinical information and data, for an opinion." Dr. Latimer added that he "reserve[d] the right to modify [his] opinion, concerning criminal insanity . . . pending valid documentation." Nonetheless, on September 13, 2010, at a status conference in defendant's presence, trial counsel informed the court that the defense would not be pursuing an insanity or diminished capacity defense, and "there appears to be no further need to explore that avenue."

In July 2016, PCR counsel notified the court he was seeking medical records from OPD that defendant's father had previously provided to trial counsel. In January 2018, attached to his supplemental PCR petition were affidavits from defendant's mother Thresia Pallipurath (Thresia), and father, Mathai Pallipurath (Mathai), attesting in a joint statement that defendant "had a very tumultuous up bringing" and had been diagnosed with post-traumatic stress

10

disorder and depressive disorder as an eight-year-old. They said defendant was subsequently diagnosed with severe depressive disorder with psychotic symptoms, along with attention deficit hyperactivity disorder, conduct disorder, and adjustment disorder. In 2008 or 2009, they gave all mental health records pertaining to defendant in their possession to trial counsel. They also stated that they wanted to testify at defendant's trial regarding his mental illness, but trial counsel's secretary advised them not to, telling them "it was not safe" to come to New Jersey and "not important" for them to testify.

In a separate affidavit in her native Malayam language, which was claimed to be accurately translated to English, Thresia discussed cruel episodes of physical abuse that she, defendant, and his siblings suffered at the hands of Mathai, a severe alcoholic with psychological disorders. Thresia began to observe changes in defendant's behavior at the age of six and sought to have him treated by a psychologist. The psychologist diagnosed defendant with post-traumatic stress disorder and major depression with symptoms that included auditory hallucination. Later, another specialist diagnosed defendant with attention deficit/hyperactivity disorder, prescribed medication, and referred him for counseling. Thresia said defendant went to a boarding school where he struggled academically and endured both bullying by other students and sexual

abuse by the school warden. Following a suicide attempt, defendant's family had him committed to a psychiatric institution for several months for "conduct disorder."

Mathai's alcoholism and physical abuse of defendant continued into 1995, when defendant was about thirteen-years old, and the family was living in America. After one beating, Thresia said authorities arrested Mathai and placed defendant in a foster home. When returned to Thresia's custody, defendant's behavior had changed, and he seemed "mentally unstable," leading her to call the police. Defendant stayed in a group home for the next year. Upon his return at age sixteen, Mathai had defendant arrested for assault following an altercation. With the consent of the court, Thresia removed defendant to India to receive psychiatric treatment.

According to Thresia, defendant's condition worsened in India and, one evening, he threatened to commit suicide. He was hospitalized for two months following that incident. Defendant soon returned to America with his family, where he was the victim of multiple violent assaults in California carried out by the family of the woman he was dating at the time. Thresia attested that once defendant's marriage to Reshma ended, his "mental health . . . severely deteriorated," culminating in his abrupt announcement that he was moving to

12

Georgia. Thresia did not see defendant again until after the shootings. Thresia asked trial counsel if she could testify on defendant's behalf at his trial, but he purportedly told her to stay away from New Jersey or "lots of problems could occur."

Mathai also supplied a separate affidavit, in which he said that after retaining trial counsel to represent defendant, counsel failed to communicate with him. He wrote a total of eight letters to trial counsel from October 2009 to January 2011. These generally portray an alleged failure to communicate with Mathai about the defense. In one, Mathai said he wanted to discuss defendant's "past treatments of his psychiatric disorders and several hospitalizations in India to treat his mental illness." In a letter dated December 19, 2010, Mathai complained about trial counsel's representation and stated that the family was uncomfortable with his lack of cooperation. He said he knew trial counsel would succeed with an insanity plea. By that time, however, trial counsel had already represented to the court and prosecutor that defendant was no longer pursuing the insanity and diminished capacity defenses. In a letter dated January 6, 2011, Mathai complained again about the lack of communication from trial counsel and

asked for a call to discuss what he had to share with counsel about defendant's "psychiatric history."[3]

Defendant filed a fee arbitration request in 2014. PCR counsel provided the court with trial counsel's response, in which trial counsel wrote that due to the strength of the State's case, he "decided to explore an insanity defense" and retained Dr. Latimer, with whom he had worked on previous murder trials. According to trial counsel, Dr. Latimer "concluded that [defendant] was not, in fact, legally insane at the time he committed the murders" and "opined" defendant "knew exactly what he was doing when he entered the [c]hurch on that Sunday morning with a gun in his hand." Counsel added that he had "spent a great deal of time acquiring and reviewing medical records dealing with [defendant's] psychiatric pathology stemming back to his childhood in India as well as to events in California just prior to his crimes here in New Jersey." Counsel's trial notes were attached to his response. The District Fee Arbitration Committee awarded a refund of $500 and ordered trial counsel to issue a check. On a check made out to defendant's father, trial counsel handwrote, in the "for" memo line, "A Disgusting Killer + Liar."

---

[3] Defendant supplied an affidavit stating he had a total of six "brief visits" with counsel before trial, each between five and fifteen minutes in length, for a total of about ninety minutes.

Defendant's PCR submission also included a May 8, 2016, email from trial counsel to OPD and the court, stating he was "not in possession of any file for [defendant]," as his trial folders had been destroyed in the winter of 2014. Trial counsel further stated that he had not received original copies of defendant's health records and had "already given [defendant two] sets of his file a very long time ago."

PCR counsel obtained medical records concerning psychiatric treatment defendant received in India in 1994 and 1998, and received "medical certificates" from Dr. N.D. Mohan, Senior Consultant Psychiatrist and Head of the Psychiatry Department at the Indian hospital at which defendant received treatment. PCR counsel also contacted Dr. Cordosi, who wrote back explaining that any records had "been destroyed."

PCR counsel provided the records he could obtain, including certain records from India, to Dr. Latimer who, on January 13, 2018, for the first time, submitted a completed psychiatric report concerning defendant. He did so without conducting any further examination of defendant, instead relying on notes from his 2010 examination along with the other records provided.

Dr. Latimer said he had been unable in 2010 to offer an opinion on defendant's psychological state "due to lack of relevant information." But in his

2018 report, he diagnosed defendant with Borderline Personality Disorder "as manifested by frequent auditory hallucinations, unstable interpersonal relations, parental emotional abandonment, instability, impulsivity, self-mutilation, suicidal events, chronic feelings of emptiness and depression, and dissociative symptoms with hallucinations since an early age."  Dr. Latimer opined that on the day of the shootings, defendant "was suffering from severe depression, anxiety, and voice hallucinations."  "[H]e was experiencing extreme anxiety with alteration of his cognitive faculties, further complicating his chronic mental disease."  Dr. Latimer believed based on "abundant information that [defendant] was psychotic, delusional, and hallucinating.  Therefore, he could not understand that he was doing something wrong.  His purpose was not homicide but rather a disturbed idea about taking his wife back to him."  Defendant did not, in Dr. Latimer's view, "understand the nature and quality of his acts and did not understand that he was doing something wrong," but was "psychotic," "insane," and was "suffering from a diminished capacity."

Dr. Latimer also concluded that defendant lacked "the capacity to assist in his own defense" due to his "well-documented mental illnesses."  He was unable to make an intelligent and voluntary waiver of defenses in the time leading up to trial and, prior to that, at his recorded custodial interrogation.  Dr. Latimer opined

16

that defendant "could not understand his Miranda rights and was not competent" to waive them.

Dr. Latimer supplemented the report with a letter to PCR counsel referencing "the information provided by the family, especially as to the father's horrible behavior." Dr. Latimer concluded that defendant "could not have understood the nature or circumstances of his actions," and "should not have gone to trial without the help of an expert because he was clearly mentally ill and could not have acted while understanding intelligently and knowingly the consequence of any decision." Dr. Latimer wrote that a psychiatrist should have been able to present those findings to a jury; he concluded the correspondence to PCR counsel with, "I don't understand why I wasn't called. Do you?"

Defendant contended these materials demonstrated trial counsel failed to thoroughly investigate a viable insanity or diminished capacity defense, and his representation of defendant was presumptively ineffective. See, e.g., United States v. Cronic, 466 U.S. 648, 662 (1984) ("[W]hen surrounding circumstances justify a presumption of ineffectiveness . . . a Sixth Amendment claim [can] be sufficient without inquiry into counsel's actual performance at trial."). At a June 2018 oral argument on the petition, PCR counsel contended an evidentiary hearing was not necessary.

17

The prosecutor, however, said that the State "did not oppose" conducting an evidentiary hearing. She told the judge, "there's no problem with a hearing to explore issues and also to — make a thorough record . . . . So, we don't oppose an evidentiary hearing." The judge reserved any decision, acknowledging PCR counsel's remark that the judge would either decide to grant a new trial or order an evidentiary hearing.

At an August 7, 2018, status conference, the assistant prosecutor repeatedly stated that an evidentiary hearing was necessary "on all these issues" and also wanted defendant to submit to an examination by the State's own psychiatric expert. PCR counsel repeated that an evidentiary hearing was unnecessary, noting, that his "first argument is Cronic/Fritz,[4] we don't need an evidentiary hearing. That is my primary argument." But, the prosecutor argued: "[A]s far as the evidentiary hearing, Judge, respectfully I think that we need one to be able to examine again. Because the question is not whether . . . the insanity defense was used . . . the question is why did the attorney not use it." The judge again reserved decision on the issue, noting that both sides needed the opportunity to respond to additional trial transcripts that had been ordered.

---

[4] State v. Fritz, 105 N.J. 42 (1987)

18

During an August 23, 2018 status conference, the prosecutor countered defendant's <u>Cronic</u> contentions again. Noting the judge was going to decide at the next conference whether an evidentiary hearing was necessary, and although not acceding to defendant's alternative request for one, the prosecutor told the judge, "I think it's relevant that we . . . bring in [trial counsel] to testify as to . . . why he did — what he did in this case."

When the parties reconvened approximately one month later, the judge rendered a decision on defendant's PCR petition. Essentially, the judge concluded that trial counsel asserted a viable passion-provocation defense, which was a strategic decision on counsel's part after thoroughly investigating other options. The judge then seemingly concluded that had counsel asserted an insanity or diminished capacity defense, it would have ultimately been unsuccessful.

> [T]he fact of the matter remains that if . . . defendant was truly deranged at that time . . . we would not have seen such a calculated plan prior to the homicides and post homicide. A lot of planning went into . . . [defendant's] actions here. And, they do not display or demonstrate a deranged . . . an insane mind or that [defendant] was . . . suffering from insanity or diminished capacity, and more likely based on his own statements a passion provocation type of defense.

The judge entered an order denying defendant's petition without an evidentiary hearing. Defendant moved for reconsideration, which the judge denied. This appeal followed.

Before us, defendant argues that trial counsel's performance was presumptively ineffective, or, alternatively, the judge should have ordered an evidentiary hearing because defendant asserted a prima facie case of ineffective assistance of trial counsel (IAC). Specifically, defendant argues that trial counsel failed to investigate and assert insanity or diminished capacity defenses before trial, by challenging defendant's competency to stand trial; pre-trial, by failing to move to suppress defendant's custodial statements on these grounds; and during trial, including securing defendant's consent to release to the news media a video recording of his custodial statement to Georgia authorities.

In a pro se supplemental brief, defendant reiterates some of these IAC claims and also argues that trial counsel failed to advise him of his right not to testify and allowed him to testify without assessing his competency. Defendant additionally contends that counsel abandoned the diminished capacity defense without obtaining defendant's waiver, and trial counsel failed to obtain and provide defendant with all pretrial discovery. Defendant further argues that the court failed to decide his discovery motion that sought to have the internet

20

service provider turn over all emails from Reshma's Yahoo account, which defendant claims were exculpatory. Lastly, defendant correctly notes that the Law Division has never addressed our remand on the issue of restitution. See Pallipurath, slip op. at 28–29.

We have considered these arguments in light of the record and applicable legal standards. We reverse in part and remand for an evidentiary hearing consistent with this opinion.

## II.

Usually, to prevail on an IAC claim, a defendant must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 694 (1984), as adopted by our Supreme Court in Fritz, 105 N.J. at 58. A defendant must first show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 687). As to this prong, "there is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]' [and t]o rebut that strong presumption, a defendant must establish that trial counsel's actions did not equate to 'sound trial strategy.'" State v. Castagna, 187 N.J. 293, 314 (2006) (quoting Strickland, 466 U.S. at 689). "If counsel thoroughly investigates law and facts, considering all possible

options, his or her trial strategy is 'virtually unchalleng[e]able.'" State v. Savage, 120 N.J. 594, 617 (1990) (quoting Strickland, 466 U.S. at 690–91).

"In some cases, whether counsel's conduct is reasonable 'may be determined or substantially influenced by the defendant's own statements or actions.'" State v. Martini, 160 N.J. 248, 266 (1999) (quoting Strickland, 466 U.S. at 691). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691.

Additionally, a defendant must prove he suffered prejudice due to counsel's deficient performance. Id. at 687. A defendant must show by a "reasonable probability" that the deficient performance affected the outcome. Fritz, 105 N.J. at 58. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Pierre, 223 N.J. 560, 583 (2015) (quoting Strickland, 466 U.S. at 694; Fritz, 105 N.J. at 52).

"[W]hen the level of counsel's participation makes the idea of a fair trial a nullity, no prejudice need be shown. It is presumed." State v. Davis, 116 N.J. 341, 352 (1989) (citing Cronic, 466 U.S. 648). "An example of the Cronic presumption would be a failure by counsel for the defendant to cross-examine a

key prosecution witness." Ibid. (citing Cronic, 466 U.S. at 659). In general, "only an extraordinary deprivation of the assistance of counsel triggers a presumption of prejudice . . . ." State v. Miller, 216 N.J. 40, 70 (2013) (citing Bell v. Cone, 535 U.S 685, 695–96 (2002)).

Our rules anticipate the need to hold an evidentiary hearing on PCR petitions "only upon the establishment of a prima facie case in support of post-conviction relief[.]" R. 3:22-10(b). "As in a summary judgment motion, the [PCR] judge should view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (citing State v. Preciose, 129 N.J 451, 462–63 (1992)). Although we review a PCR court's denial of an evidentiary hearing under an abuse of discretion standard, State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013) (citing State v. Marshall, 148 N.J. 89, 157–58 (1997)), we review "factual inferences the court has drawn from the documentary record" on a de novo basis. State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016) (citing State v. Harris, 181 N.J. 391, 420–21 (2004)).

III.

Initially, we reject defendant's argument that the existing record was sufficient to warrant a presumption of prejudice under Cronic. Trial counsel

explored the option of asserting other defenses through expert psychiatric testimony, and during trial, he moved to suppress defendant's two statements to law enforcement. During the charge conference, trial counsel explained his strategy of focusing on defendant's mental state, noting that he had consulted with defendant regarding his decision not to cross-examine some of the State's witnesses, and claimed to have spent time with defendant's family discussing strategy. Simply put, the current record does not support defendant's contention that trial counsel "failed to function in any meaningful sense as the [g]overnment's adversary." Cronic, 466 U.S. at 666.

As noted, counsel's decision to adopt a certain strategy at trial is usually unassailable unless "it was not preceded by a 'thorough investigation of law and facts' and a consideration of all 'plausible options.'" Savage, 120 N.J. at 618 (quoting Strickland, 466 U.S. at 690–91). In State v. O'Donnell, we reversed the denial of PCR without an evidentiary hearing noting that the defendant had "presented a plausible claim . . . that her attorney . . . urged her to plead guilty without adequate explanation despite months of preparation for trial" in a case where a potential diminished capacity defense was supported by both an expert opinion and by the defendant's mental health history. 435 N.J. Super. 351, 376–77 (App. Div. 2014). Irrespective of whether "a jury may have been persuaded

24

to reject [the expert's] opinion, or that of another defense expert . . . it [wa]s not self-evident that pleading guilty was a reasonable strategy." Id. at 376. Granting the defendant the benefit of all favorable inferences, we held that the PCR judge erred by denying petition without testing it at an evidentiary hearing, since the defendant had established a prima facie claim. Id. at 376–77.

Here, the critical issue is whether trial counsel conducted an adequate investigation of a potential defense, or whether, as Dr. Latimer seemingly asserted, counsel failed to supply the expert with the necessary background information by which he could render a definitive report. That issue cannot be decided on the record that exists, and as noted, even the prosecutor seemed to sense that an evidentiary hearing was necessary to resolve "why" Dr. Latimer was not called as a witness. As the Court has noted, sometimes, "[t]here is no substitute for placing a witness on the stand and having the testimony scrutinized by an impartial factfinder." State v. Porter, 216 N.J. 343, 356 (2013). This was such a case.

We hasten to add that we do not find definitively that defendant has met the first prong of the Strickland/Fritz standard, i.e., that trial counsel's performance was deficient. We only conclude that providing defendant with all favorable evidence and inferences, the reasonableness and thoroughness of

counsel's investigation was an issue of disputed fact. See Porter, 216 N.J. at 354 ("The judge deciding a PCR claim should conduct an evidentiary hearing when there are disputed issues of material facts related to the defendant's entitlement to PCR, particularly when the dispute regards events and conversations that occur off the record or outside the presence of the judge.").

"The prejudice prong of Strickland remains an 'exacting standard.'" State v. Gideon, 244 N.J. 538, 561 (2021) (quoting State v. Allegro, 193 N.J. 352, 367 (2008)). "Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial." Pierre, 223 N.J. at 583. Here, as already noted, the State's case was substantial.

However, that assessment is made without the benefit of Dr. Latimer's opinions, which encompassed not only defendant's mental state at the time of the crimes, but also his competency to waive his rights and speak to the Georgia authorities and to stand trial. In other words, unlike other situations, the absence of this particular witness's testimony may have had a profound effect on all that followed. It is even more difficult to consider the prejudice prong because had defendant asserted these defenses, the State would have had the opportunity to retain its own expert and rebut Dr. Latimer's opinions.

Clearly, if the PCR court concludes that trial counsel did not render deficient assistance and his decision not to produce Dr. Latimer or some other expert represented reasonable professional judgment reached after adequate investigation, the prejudice issue is irrelevant. But, if the PCR court concludes otherwise, then it must assess the worth of Dr. Latimer's opinions in light of all competing evidence, including psychiatric evidence the State may marshal, and decide whether defendant has met the burden of demonstrating counsel's deficient performance undermined confidence in the results of the trial.

We therefore remand the matter for the PCR court to conduct an evidentiary hearing on defendant's IAC claim as it relates to trial counsel's decision not to assert issues of defendant's competency and his mental state at the time of the killings, immediately thereafter, and at the time of trial. In the context of this claim, the judge may consider the assertions that trial counsel failed to adequately confer with defendant and his family. We leave the conduct of the evidentiary hearing, and whether the State is entitled to have defendant evaluated by its own expert, to the court's sound discretion. We also direct the court to reconsider the issue of the previously ordered restitution, something we directed in our prior judgment and which has not yet occurred.

A-3330-18

We address some of the other issues raised to clarify that the PCR court need not address them. We considered the release of the video of defendant's statement to the news media and whether it prejudiced defendant on direct appeal, concluding, "[t]he record does not reflect that the release of defendant's recorded statement infringed upon the fairness of the trial in any way." Pallipurath, slip op. at 16. The PCR judge need not address it further.

We also reject defendant's pro se argument that trial counsel never advised him that he could waive his right to testify and remain silent. The trial record belies the claim, and the PCR judge need not address it further. Finally, the other issues raised in defendant's pro se brief regarding trial counsel's failure to provide him with discovery and the denial of his request for the judge to order the internet provider to produce all of Reshma's emails lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3330-18